# District of Columbia
# Court of Appeals

**No. 15-CF-504**

JAMES J. DORSEY,

Appellant,

v.

FILED

FEB **23** 2017

DISTRICT OF COLUMBIA
COURT OF APPEALS

CF3-9678-13

UNITED STATES,

Appellee.

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: BLACKBURNE-RIGSBY, THOMPSON, and MCLEESE, *Associate Judges*.

**J U D G M E N T**

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the Superior Court is affirmed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: February 23, 2017.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice:   This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 15-CF-504

JAMES J. DORSEY, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED   2/23/17
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court
of the District of Columbia
(CF3-9678-13)

(Hon. Anita Josey-Herring, Trial Judge)

(Argued September 28, 2016                    Decided February 23, 2017)

*Cecily E. Baskir* for appellant.

*L. Jackson Thomas II*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *John P. Mannarino* and *William Schurmann*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, THOMPSON, and MCLEESE, *Associate Judges*.

THOMPSON, *Associate Judge*:   A jury convicted appellant James J. Dorsey of unlawful possession of a firearm ("UPF"), possession of an unregistered firearm ("UF"), and unlawful possession of ammunition ("UA").  He seeks reversal of his convictions on the grounds that there was insufficient evidence for jurors to find

beyond a reasonable doubt that he possessed the firearm and ammunition in question, and that the government's delay in disclosing information favorable to his defense violated his right to due process. Appellant also argues that the trial court abused its discretion when it failed to afford the defense a mid-trial continuance to obtain its own DNA expert. Finally, appellant argues that it was error for the trial judge — who acknowledged that she otherwise "would not have given [appellant] three years in jail" — to impose a three-year mandatory minimum sentence for the UPF charge, based on the court's determination that appellant had a prior conviction for a crime of violence, without the jury having so found. We affirm.

## I.

The evidence at trial established that on June 7, 2013, several members of the Metropolitan Police Department ("MPD") executed a search warrant of an apartment located at 4701 Alabama Avenue, S.E.[1] Among the eight or so officers present were Officer Robert Ranck, Detective Anthony Campanalle,[2] and Officer

---

[1] The warrant was unrelated to appellant and the crimes of which he was convicted.

[2] "Campanalle" also appears in the record as "Campanale."

Mark Allen Dega. Officer Ranck testified that as the officers, who were all wearing vests that said "police," approached the residence, they observed appellant and two women standing on the balcony of the apartment. Appellant reacted by "enter[ing] into the apartment." "Less than a minute" later, after knocking on the apartment door and announcing their presence, the officers used a battering ram to force entry into the apartment unit. Officer Ranck testified that appellant and four other individuals, including two adult females, one juvenile male (who was in a back bedroom located about fifteen feet from the apartment's kitchen),[3] and a female child, were inside the apartment (or on the balcony). Detective Campanalle testified that, as the officers made entry into the apartment, he saw appellant "exiting the kitchen area . . . ."[4]

Officer Dega testified that during the search, one of the officers found a .357 Magnum revolver located on the top shelf inside a cabinet in the apartment's kitchen. Officer Dega, a crime scene technician, testified that after photographing

---

[3] Although defense counsel implied in his questioning of the government's DNA expert and in closing argument that the juvenile male was appellant's son or was otherwise related to appellant, no evidence was presented about whether appellant and the juvenile were related.

[4] Officer Ranck, who was towards the rear of the line of officers who entered the apartment, testified that he saw appellant near the kitchen but only after appellant had been handcuffed.

the gun on the shelf, he retrieved the gun, placed it on a kitchen countertop to photograph it, and thereafter placed the gun in a paper bag for transmission to the police station.

The government's evidence at trial also included the testimony of DNA analyst Andrea Borchardt-Gardner. Borchardt-Gardner testified that from the biological material collected from a swab of the gun, she was able to develop a partial DNA profile (i.e., eight of the fifteen locations that would constitute a full profile) that was from a single male contributor.[5] Borchardt-Gardner testified that she compared that profile with appellant's DNA profile and found that "every allele [she] detected in the evidence sample was consistent with [appellant]." She concluded that appellant could not be excluded as a possible contributor of the partial DNA profile recovered from the gun. Based on a statistical analysis, she determined that the probability of randomly selecting another individual unrelated to appellant with the same partial DNA profile as the one recovered from the gun was one in 290 billion in the U.S. Caucasian population, one in eleven billion in the U.S. African-American population, and one in 52 billion in the U.S. Hispanic population. Borchardt-Gardner also testified that, while she had read a scholarly

---

[5] Borchardt-Gardner stated that the amount of DNA obtained from the gun was "approximately one quarter of the amount that we would ideally want to produce a robust profile."

article about the secondary transfer of skin cell DNA (e.g., the transfer of DNA from skin cells present on an object to another object when the two objects touch), she had never encountered such a transfer in her own experience (as a supervising and senior DNA forensic analyst). She further testified that "[n]obody has the same DNA except for identical twins" and that a "son would share 50 percent of [his father's] DNA."

After the jury found appellant guilty on all three counts, the court sentenced him to the three-year mandatory minimum sentence described in D.C. Code § 22-4503 (b)(1) (2012 Repl.), based on his 1999 conviction in Maryland for first-degree assault.

## II.

Appellant contends that the evidence was insufficient to prove beyond a reasonable doubt that he possessed the gun found in the kitchen cabinet or its ammunition. When reviewing an insufficiency-of-the-evidence claim, we view the evidence in the "light most favorable to the government, drawing all reasonable inferences in the government's favor, and giving deference to the jury's right to determine credibility and weight." *Rollerson v. United States*, 127 A.3d 1220,

1232 (D.C. 2015) (quoting *Blakeney v. United States*, 653 A.2d 365, 369 n.3 (D.C. 1995)). "An appellant making a claim of evidentiary insufficiency bears the heavy burden of showing that the prosecution offered no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013) (internal quotation marks omitted) (quoting *Olafisoye v. United States*, 857 A.2d 1078, 1086 (D.C. 2004)).

To sustain a conviction for UPF, the evidence "must show that 1) the defendant had been convicted of a felony and 2) that he owned or kept a firearm, or that he had a firearm in his possession or under his control." *Hammond v. United States*, 77 A.3d 964, 969 (D.C. 2013) (internal quotation marks omitted). To support a conviction for UF, the evidence "must show 1) that the defendant knowingly possessed a firearm; and 2) that firearm had not been registered as required by law." *Id.* (internal quotation marks omitted). In general, to support a conviction for UA, the evidence must show that that the defendant possessed ammunition without having the necessary registration for a firearm. D.C. Code § 7-2506.0l (a)(3) (2012 Repl.). A weapon can be actually or constructively possessed. *See Gorbey v. United States*, 54 A.3d 668, 700 (D.C. 2012). "Constructive possession of a weapon requires proof that a defendant (1) knew of the weapon's location; (2) had the ability to exercise dominion and control over it;

and (3) intended to exercise such dominion and control." *Id.* (internal quotation marks omitted). "The government may establish these elements by either direct or circumstantial evidence." *Id.* (internal quotation marks omitted). Evidence showing defendant's "connection with a gun" or "evasive conduct . . . coupled with proximity may suffice" to establish constructive possession. *United States v. Alexander*, 331 F.3d 116, 127 (D.C. Cir. 2003) (internal quotation marks omitted).

In this case, a number of factors support an inference that appellant constructively possessed the gun. First, although there was no evidence that appellant resided in the apartment,[6] the government's evidence was that, of those present in the apartment at the time police officers entered, appellant was the only one seen exiting and in close proximity to the kitchen where the gun was found. Second, Officer Ranck testified that appellant immediately left the balcony when he saw the police officers approaching. The jury could infer that this was evasive conduct by appellant consistent with a consciousness that he needed to ensure that any contraband was off his person or hidden. *See Alexander*, 331 F.3d at 127 ("[E]vasive conduct . . . coupled with proximity [to an item] may suffice" to prove

---

[6] Thus, our observation that "a jury is generally entitled to infer that a person exercises constructive possession over items found in his home," *Evans v. United States*, 122 A.3d 876, 889 (D.C. 2015) (citation omitted), does not apply here. In any event, such an inference is "weakened" where there is "evidence that appellant shared the apartment with . . . several others." *Schools*, 84 A.3d at 509.

constructive possession of the item.). Third, the sketch of the apartment's layout that was entered into evidence as Government Exhibit 14 showed that (as the prosecutor told the jury in his opening statement) there was "only one way in and one way out" of the kitchen, meaning that appellant did not simply pass through the kitchen on his way to another area of the apartment. From this, the jury could infer that appellant purposefully went into the kitchen after seeing the police officers approaching the apartment building. Most important, at every location in the partial DNA profile derived from a swab of the gun, there was a match with appellant's DNA profile — a "connection" between appellant and the gun. *Id.* (explaining that evidence showing defendant's "connection with a gun . . . coupled with proximity may suffice" to prove constructive possession). Borchardt-Gardner's testimony suggested that there was a low probability that appellant's DNA got on the gun by secondary transfer; there was, per her statistical analysis, a miniscule probability that any person unrelated to appellant would have the same DNA partial profile as the one from the gun; her analysis indicated that there was a single contributor to the DNA found on the gun (i.e., there was no other DNA on the gun to suggest that anyone else had handled it) and that the single contributor was male; there was no evidence that the only other male found in the apartment was related to appellant, and thus no evidence that his profile would be similar to appellant's; and in any event, the other male's profile would not have been

identical to appellant's, because he was a juvenile and thus could not have been appellant's identical twin.

Citing Borchardt-Gardner's testimony that DNA that has been deposited on an item may "break down to the point where we may be unable to detect it" and that the expert's analysis could not indicate when appellant's DNA was deposited on the gun, appellant emphasizes that the absence of any other contributor's DNA on the gun does not mean that no one else possessed the gun or came in contact with it more recently than appellant. Appellant also emphasizes Officer Dega's testimony that he placed the gun on a kitchen counter to photograph it and argues that the possibility that there was a secondary transfer to the gun of appellant's DNA present on the counter necessitates reasonable doubt about whether appellant ever had contact with the gun.[7] But to prove beyond a reasonable doubt that appellant possessed the gun on the day of the search, the government was not required to "negate 'every possible inference of innocence,'" and it was not necessary that the evidence "'compel a finding of guilt.'" *Rollerson*, 127 A.3d at 1232 (quoting *Timberlake v. United States*, 758 A.2d 978, 980 (D.C. 2000)). We are satisfied that the evidence as a whole, viewed in the light most favorable to the

---

[7] The points appellant emphasizes were argued to the jury or brought out on cross-examination, and jurors were able to (and presumably did) take them into account when weighing the evidence.

government, permitted the jury to infer beyond a reasonable doubt that appellant knew of the gun's location and had the ability and intent to exercise dominion and control over the gun before the officers burst into the apartment.

## III.

Appellant's next claim is that the government's "cryptic" disclosure, on the day before jury selection began, of the name and number of a case in which an important government witness was involved, and the court's subsequent refusal to grant a continuance to allow the defense to investigate the matter further, amounted to a violation of appellant's constitutional due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The background is as follows.

## A.

In the morning of January 21, 2015, the prosecutor handed appellant's counsel a handwritten note reading, "Officer Campanale  Wesby v. DC – Case No. 12-7127[,] Sept. 2, 2014." The prosecutor told the court that the case number and date corresponded to "a summary judgment" opinion, but the case number and date actually corresponded to *Wesby v. District of Columbia* (*Wesby II*), 765 F.3d 13

(D.C. Cir. 2014), *cert. granted*, 2017 U.S. LEXIS 788 (U.S. Jan. 19, 2017) (No. 15-1485), a decision of the United States Court of Appeals for the District of Columbia. The D.C. Circuit decision affirmed a summary judgment ruling by the United States District Court for the District of Columbia and a subsequent jury-trial verdict in a § 1983/false arrest case. The District Court had found Detective Campanalle, one of the MPD officers named as defendants in the case, liable as a matter of law for the unlawful arrest of twenty-one individuals for unlawful entry. *See Wesby v. District of Columbia* (*Wesby I*), 841 F. Supp. 2d 20, 49 (D.D.C. 2012). The court reasoned that then-Officer Campanalle was not entitled to qualified immunity from suit because he had arrested individuals for unlawful entry even though (as he acknowledged in his deposition in the case) he had information that they had been invited to the premises. *Id.* at 28–29, 37–38. The court concluded that Campanalle's belief that he had probable cause for the arrests was "neither bona fide nor reasonable." *Id.* at 46. Nor, the court found, was there probable cause for the individuals' arrests for disorderly conduct. *Id.* at 33. When the matter went to trial, the jury assessed damages against Campanalle and another one of the arresting officers. *See Wesby II*, 765 F.3d at 17.

During the pre-trial proceeding on January 21 in this case, which commenced after the prosecutor's disclosure, defense counsel told the court that he

had only "skim[med]" the (fifty-page) summary judgment ruling, which he had found within forty-five minutes after the prosecutor gave him the case number and date of the D.C. Circuit opinion. Defense counsel was able, however, to give the court the case number of the District Court case and to summarize the summary judgment ruling for the court. Defense counsel's summary was as follows:

> It was unlawful arrest. Apparently there was a party and they made some arrests of the individuals at that party and later took them back to the police station where they changed the charge altogether, but it was an arrest for an unlawful entry and the people had permission to be there and more specifically the officer in question, plus two additional officers were specifically found on a motion for summary judgment, so it was a determination by the judge, not by a jury, that the arrest was in fact unlawful and that they were denied their constitutional rights.
>
> . . .
>
> [T]he court did find that [Officer Campanalle] knew the circumstances before he made the arrest. He knew that the people who were inside the house had permission from another person who told them that they could be there, but then he still made the arrest anyway and he made that finding and found that he knew those facts before he made that arrest.

The court agreed to read the summary judgment ruling, and the prosecutor stated that he would call Officer Campanalle to testify the next day at the earliest.

The court and the parties then moved to a discussion of the *voir dire* process, and, after a recess, defense counsel made an oral motion to dismiss the case in light of the timing of the government's disclosure of information about the *Wesby* case and other matters (e.g., Officer Ranck's grand jury testimony, "a different copy of the PD 81" form, and new information that contradicted the PD 163 form), materials that counsel said were "an accumulation of stuff at the last minute." Recognizing that defense counsel was newly appointed and perhaps had not had an opportunity to review all the discovery the government had provided to previous counsel, the court instructed counsel to go through the discovery so that the court could take up the next day any matter that defense counsel thought would impact the defense case. The January 21 proceeding was adjourned for the day at 2:35 p.m.

The next day, January 22, the trial court told the parties that it had read the District Court's ruling (which the trial court commented was "dense" and "certainly a big thing to sort of drop on somebody at the last minute") and invited defense counsel to address the matter. Defense counsel told the court that he "had a chance to look [the ruling] over" and that "it sort of changes my strategy and changes the way I have been viewing this case . . . ." Telling the court that "what's at issue here is Officer Campanal[l]e is one of the officers who said he saw Mr.

Dorsey leaving the kitchen area" and that "those facts in the civil case . . . are getting at issues that I may want to raise or may want to explore even further regarding the pattern and practice of the D.C. Police Department," counsel said that he wanted the opportunity to view what Officer Campanalle said in the depositions and interrogatories that the court quoted in *Wesby*.[8] The court responded that "the whole police department is not on trial" and that the defense did not "need all the underlying documents in connection with the civil case[,]" noting that the defense "wouldn't be entitled to bring in all of th[at] information . . . ." The court told counsel that he could and "should be able" to cross-examine Detective Campanalle using the District Court's finding that Campanalle did not have a legal basis for arresting the *Wesby* plaintiffs. Remarking that the defense had obtained a copy of the *Wesby* ruling the previous day and "should be prepared to go forward," the court said that it could have the government not call Detective Campanalle during the first day of testimony.[9]

---

[8]   Counsel also told the court that the *Wesby* record could contain information "regarding past testimony" by Officer Campanalle or regarding "misconduct complaints." He told the court that with earlier notice of the *Wesby* matter, he "could have easily just picked up the phone and called plaintiff's counsel."

[9]   During this exchange, counsel also mentioned again his concern about the timing of the government's disclosure of Officer Ranck's grand jury testimony, which counsel said was inconsistent with the officer's preliminary hearing testimony about the number of people who were in the apartment and on the
(continued…)

Defense counsel then told the court that he was "ready to go forward." The court denied the request for a continuance, noting that one of the reasons for not ordering a continuance (which, according to defense counsel's statement to the court during a bench conference, appellant thought counsel should be "pressing" for so that a new lawyer could step in to assist) was the court's worry that "there's a delay tactic here" on the part of appellant, who was on his third lawyer.

Thereafter, during a conference after the jury was sworn in (and then immediately dismissed until January 23), defense counsel acknowledged to the court that he had "read [the *Wesby* ruling] fully . . . ." The court told counsel that the ruling was a basis for him to conduct "corruption[-]bias type cross[-]examination" and observed that because Detective Campanalle would not be testifying on January 23, that would give counsel "some more time to see how [he could] incorporate this information." As the court was summarizing the findings in *Wesby*, defense counsel interjected:

---

(…continued)
balcony and about where appellant was standing when the police made entry. The court stated that it did not understand the prejudice since the grand jury testimony was not voluminous and since the defense had had it overnight, but eventually said that it would ask the government not to call Officer Ranck to testify on January 23 so that defense counsel could "retool [his] examination and . . . theory . . . ."

May I add also, Your Honor, to point directly into the memorandum opinion, pages 9 and 10 specifically talk about what Officer Campanal[l]e did in that he made the arrest knowing certain information -- . . . after having information that the people who were inside the residence had spoken to Peaches [who claimed to be the lessee of the premises] and they had gotten permission from her and despite that he used . . . another officer's information to make the arrest and just said, okay, let's do an unlawful arrest . . . .

When court convened at 11:36 a.m. on the morning of January 23, defense counsel told the court that he "still ha[d] to find information," but that the D.C. Circuit had "affirmed the . . . summary judgment and the trial." Shortly thereafter, the prosecutor and defense counsel made their opening statements. Defense counsel made no mention of the *Wesby* rulings or Detective Campanalle's role in that case.

Detective Campanalle was not called to testify until Monday, January 26. When the prosecutor asked Detective Campanelle on direct examination whether he had been involved in *Wesby*, Campanalle acknowledged that he was one of the arresting officers in the case, which involved multiple individuals arrested for unlawful entry. He testified that the result of the case was that he was "found not to be liable through a jury trial." Campanalle repeated that testimony on cross-examination, stating that it was "not correct" that "[t]he [j]udge found that [he] had

unlawfully arrested people for unlawful entry," denying that he had "lost on appeal," saying that he "didn't have anything to do with an appeal," and denying knowledge that he had "lost the summary judgment . . . ." In the face of that testimony, defense counsel requested a five-minute recess to research whether the $648,000 in damages shown on the *Wesby* jury verdict form "was actually against the officers and him." The prosecutor told the court that the government was willing to stipulate that the District Court found "no probable cause to arrest people for an unlawful entry or for a disorderly conduct."[10] Defense counsel pressed his request for a recess, saying that the *Wesby* case had been "sprung on [him] at the last minute." The court reminded counsel that he had received notice of the ruling "last week" (January 21) and that it was now Monday (January 26), but that counsel could have ten minutes to find what he wanted. Defense counsel then said that he would "just move on" and that "[w]e can do it by judicial notice. That would be fine."[11] The court thereafter read the following to the jury:

---

[10] The prosecutor explained that he believed the detective's testimony was based on the fact that he "was not directed to pay anything."

[11] The court nevertheless called a ten-minute recess, though expressing doubt that "the amount of the verdict . . . is really one to be explored." After court reconvened, defense counsel elicited Detective Campanalle's agreement that all sixteen of the *Wesby* plaintiffs were "awarded compensatory damages . . . for [the detective's] trial." On re-direct, Detective Campanalle testified that he had never paid any money to any of the people who had sued but that the District of Columbia had done so.

> [T]he U.S. District Court for the District of Columbia . . . did enter a finding of summary judgment against . . . Officer Campanalle . . . for arresting Mr. Wesby and others in the house that the officer described for unlawful entry and disorderly conduct.
>
> The [j]udge determined in a summary judgment order that there was no lawful basis for arresting Mr. Wesby and the rest of the occupants in that case for unlawful entry or disorderly conduct.

In his closing argument, defense counsel pointed to Detective Campanalle's testimony that "he was found not liable" even though "the [j]udge found that he was responsible for unlawfully arresting people, for saying stuff that he knew was not true and then arresting them." Counsel argued, "Now, he is coming to you today to tell you something that we say is not true[,]" i.e., that he "saw [appellant] coming from the kitchen."

**B.**

Appellant now argues that "the government's last-minute, enigmatic disclosure related to *Wesby*" and the trial court's refusal to delay the proceedings so that defense counsel would have additional time to rework his case presentation and to conduct an investigation "precluded [him] from using favorable, material

impeachment evidence effectively in the preparation of his defense." For the reasons that follow, we are not persuaded by this argument.

*Brady* establishes that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Accordingly, "the prosecution must disclose exculpatory material 'at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case, even if satisfaction of this criterion requires pre-trial disclosure.'" *Edelen v. United States*, 627 A.2d 968, 970 (D.C. 1993) (quoting *United States v. Pollack*, 534 F.2d 964, 973 (D.C. Cir. 1976)). We have no trouble concluding that the foregoing rule — that the government must disclose *exculpatory* material "at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case" — applies as well to corruption-bias, impeaching information. *See Vaughn v. United States,* 93 A.3d 1237, 1258 n. 24 (D.C. 2014) ("No less than exculpatory information, the defense is entitled to make thoughtful, effective use of impeaching information in the preparation of its case."). The government commits a "true *Brady* violation," *Mackabee v. United States*, 29 A.3d 952, 959 (D.C. 2011), where (1) "[t]he evidence at issue [is] favorable to the accused, either because it is

exculpatory, or because it is impeaching;" (2) "that evidence [is] suppressed by the [government], either willfully or inadvertently;" and (3) "prejudice [has] ensued," meaning that the suppressed evidence was material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *see also Vaughn*, 93 A.3d at 1254 ("[I]impeaching information does not have a lesser standing in the context of the government's *Brady* disclosure obligations."). Evidence is material when "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 470 (2009). "[W]hether a defendant has established a violation by the government of its obligations under *Brady* 'presents a mixed question of fact and law,' calling for us to 'review the [trial] court's legal conclusions on a *de novo* basis and its factual findings under the clearly erroneous standard.'" *Mackabee*, 29 A.3d at 959 (quoting *Miller v. United States*, 14 A.3d 1094, 1120 (D.C. 2011)).

Appellant contends that "a few days during trial was insufficient time for" defense counsel to meaningfully incorporate *Brady* material into its defense theory, but the record does not support that contention, whether it is deemed to raise a factual or legal issue. Appellant, who "has the burden of proving a *Brady* violation," *id.*, has not "established that he was prevented from using the [*Wesby*

disclosure] by resource limitations or the time pressures of trial." *Miller*, 14 A.3d at 1131.

Appropriately, the trial court admonished the prosecutor (who told the court on January 21 that he himself had not had an opportunity to read the rulings in *Wesby*) that the government should make disclosures in a manner "so that people don't have to . . . chase down . . . accurate . . . information" and "don't have to dig [to] find all of it . . . ."[12] However, the court quite reasonably perceived that, with the time that had transpired since the government's disclosure and defense counsel's obvious familiarity with the case, counsel should have no difficulty effectively using the government's *Wesby* disclosure as part of the defense strategy. As recounted above, defense counsel received the government's disclosure on the morning of Wednesday, January 21, 2015; counsel did not make his opening statement until around noon on January 23; and Detective Campanalle did not testify until the late afternoon of Monday, January 26, 2015 (sometime after court reconvened at 3:25 p.m.). Within forty-five minutes of receiving the

---

[12] The court's comments addressed the completeness of the government's disclosure rather than its timeliness, but this court "has emphasized that a prosecutor's timely disclosure obligation with respect to *Brady* material can never be overemphasized, and the practice of delayed production must be disapproved and discouraged." *Miller*, 14 A.3d at 1108 (quoting *Boyd v. United States*, 908 A.2d 39, 57 (D.C. 2006) (brackets and internal quotation marks omitted)); *see also id.* at 1111 (rejecting the notion that "'very late is good enough'").

government's disclosure of the D.C. Circuit case number, defense counsel had pulled up the district court's summary judgment ruling. By the time court convened (just before 11:00 a.m.) on January 21, and the court and the parties began discussing the matter, counsel had skimmed the ruling and was able to tell the court that the district court judge had determined that Detective Campanalle had made unlawful arrests for unlawful entry and had done so even though he knew the circumstances before he made the arrests, i.e., "that the people who were inside the house had permission from another person who told them that they could be there." The January 21 proceedings were adjourned for the day at 2:35 p.m., and by the time the court and the parties discussed the matter again on January 22, defense counsel told the court that he had "had a chance to look . . . over" the *Wesby* ruling and that it had "change[d] [his] strategy and change[d] the way [he] had] been viewing this case." Counsel thereafter told the court that he was "ready to go forward" and acknowledged that he had read the *Wesby* ruling "fully." Moreover, the trial judge articulated how the defense could use the *Wesby* findings, telling counsel that the district court's findings would support "corruption[-]bias type cross[-]examination." Counsel himself was able to point the court to specific page numbers of the summary judgment ruling that discussed the finding that Detective Campanalle had made the unlawful arrests while knowing that the

arrestees had received permission to use the premises and "just said, okay, let's do an unlawful arrest."

Thus, the record shows that by the time defense counsel made his opening statement on the late morning of Friday, January 23, he was aware of both the district court ruling and the D.C. Circuit opinion in the matter, had had time to fully read the summary judgment ruling, was able to supplement (including by reference to page numbers) the court's summary of the district court's findings, and knew — from the court's suggestion, if not from his own analysis — that the *Wesby* ruling gave him the basis to establish through cross-examination that Detective Campanalle's testimony (including the key testimony that he saw appellant exiting the kitchen when the police entered the apartment) was not to be credited because of the detective's corruption bias.[13]

On this record, we cannot agree that appellant was precluded from using the *Wesby* disclosure effectively in the preparation of his defense. We think defense

---

[13] *See Longus v. United States*, 52 A.3d 836, 852–54 (D.C. 2012) (quoting 1 *McCormick on Evidence* §39, at 174 (6th ed. 2006)) (explaining that corruption bias includes "making . . . baseless charges"); *In re C.B.N.*, 499 A.2d 1215, 1219 (D.C. 1985) (quoting 3A John H. Wigmore, *Evidence in Trials at Common Law* §§ 956–64 (Chadbourn ed. 1970)) (explaining that corruption bias is a "willingness to obstruct the discovery of the truth by manufacturing or suppressing testimony").

counsel's omission from his opening statement of any mention of the *Wesby* findings or of Detective Campanalle's role in the case cannot be attributed to a lack of sufficient time to incorporate into his defense strategy what he had learned as a result of the government's disclosure.[14] Further, defense counsel was able to use his knowledge about the *Wesby* verdict to show that Detective Campanalle's testimony that he had been found "not liable" was untrue and thus to impeach the detective's credibility. He was able to (and did) argue that in light of the finding in *Wesby* that Detective Campanalle was liable "for saying stuff that he knew was not true and then arresting them[,]" the detective's statement that he saw appellant exiting the kitchen was not to be believed. Appellant does not challenge the court's ruling that additional, unrelated matters he speculated he might find if given more time would not be admissible at trial. And even now — having had many months during which his counsel could have contacted the attorneys in *Wesby* to learn of any additional impeaching material, appellant does not identify any information in, or any leads derived from, the *Wesby* case record that possibly

---

[14] And to the extent there was more in the *Wesby* ruling that appellant wanted the jury to know, nothing in the record suggests that the trial court would have refused to include additional information in the statement it read to the jury about the case.

would have made a difference to the outcome of his case.[15] We therefore conclude that appellant has not met his burden of establishing a "true *Brady* violation." *Mackabee*, 29 A.3d at 959.

# IV.

After the close of the government's case on January 26, defense counsel told the court that the defense would need to secure the testimony of its own DNA expert. Counsel explained that the police officers' testimony, which (for the reasons discussed in note 9 *supra*) was presented "a little out of order" after Borchardt-Gardner had testified, had raised questions that he "would have asked the [government's] DNA expert witness" had she not been called to testify before the officers testified. Specifically, counsel explained that it was only after hearing Officer Dega's testimony that counsel knew what he had earlier only suspected: that the officer had placed the gun on a counter in the kitchen before placing it in an evidence bag. Counsel told the court that the defense needed an expert to testify about "the preservation and collection" of DNA "just to clear up some DNA

---

[15] The issue is "whether the timing of the government's disclosure . . . violated appellant's due process rights because the timing of the disclosure was 'material' to the outcome." *James v. United States*, 580 A.2d 636, 644 (D.C. 1990).

matters," not to testify about "actual tests." The court, having heard from defense counsel that, previously, appellant's "lack of funds" had "potentially impacted" the defense decision about whether to call a defense DNA expert, notified counsel that the court "was willing to . . . sign a voucher" to pay for an expert. After admonishing counsel about the defense's failure to have filed a Super. Ct. Crim. R. 16 disclosure, the court told counsel that the defense would be required to have its expert in court by 10:45 a.m. the next day and to give the government "some notice about what you . . . expect an expert to say." Counsel responded, "I think that I can get him [i.e., the expert]."

When court convened on January 27, defense counsel told the court that the expert ("Mr. Mitchum") with whom counsel had been dealing was unavailable and could not be available until the next day (and that "another company" as well was "unavailable for today"). The court, commenting that the issue seemed to be availability rather than money, ruled that the trial would proceed without further delay. The court stated, "We are in trial. We are in progress. So, we will move forward."

Appellant now argues that the court erred when it gave him "an unreasonably short time" to secure the presence of a defense DNA expert where

his "inability to pay for the expert was the only identified reason why the expert was not procured in advance." This court reviews a trial court's denial of a mid-trial continuance or delay in trial proceedings for abuse of discretion. *See Jones v. United States*, 127 A.3d 1173, 1189 (D.C. 2015); *Moctar v. United States*, 718 A.2d 1063, 1065 (D.C. 1998) ("As we have repeatedly held, the grant or denial of a continuance rests within the sound discretion of the trial judge, to whom we accord wide latitude."). Factors relevant to a determination of whether there has been an abuse of discretion include "the probative value of the . . . proffered testimony" of the witness that assertedly would be available with a continuance, "the likelihood the witness would have appeared had the continuance been granted, the diligence and good faith of the party seeking the continuance, the prejudice resulting from the denial of the continuance, any prejudice the opposing party would have suffered had the continuance been granted, and the duration of the requested continuance and any likely resulting disruption or delay of the trial." *Jones*, 127 A.3d at 1189 (citation omitted); *see also Brooks v. United States*, 130 A.3d 952, 960 (D.C. 2016) (quoting *Daley v. United States*, 739 A.2d 814, 817 (D.C. 1999)) (enumerating the above factors); *Kyle v. United States*, 759 A.2d 192, 196 n.2 (D.C. 2000) ("A party seeking a continuance must make a showing that [the continuance] is reasonably necessary for a just determination of the cause . . . ." (internal quotation marks omitted)). "The trial court also may properly

consider the public's interest in the 'prompt, effective, and efficient administration of justice.'" *Brooks*, 130 A.3d at 960 (quoting *Leak v. United States*, 757 A.2d 739, 744 (D.C. 2000)).

On the entire record before us, we cannot say that the trial court abused its discretion in determining to proceed with the trial without giving appellant another day to (possibly) procure an expert witness. The court took care to assure that the reason why appellant could not secure the expert's immediate presence was not financial. Earlier, in discussing whether the defense needed additional time in light of the *Wesby* and other disclosures, the court had expressed concern about continuing the case for the third time (noting that appellant had occasioned two previous continuances when he changed counsel) and about a "delay tactic" by appellant. These were legitimate concerns that also applied in the context of whether a delay in the trial was warranted for defense counsel to secure the testimony of a DNA expert.

Further, at the time the issue of a defense expert was before the court, the defense had no other witnesses to present, meaning that if the court had afforded appellant an additional day to obtain an expert, most of January 27 would have been wasted. Court convened at 10:55 a.m. on that day, and the business before

the court — admission of several exhibits and a discussion of jury instructions — took less than two hours (enabling jurors to leave the courtroom to begin deliberating at 12:55 p.m.). Further, the prosecutor told the court that if a defense DNA expert was to testify, the prosecutor would need to consult again with Borchardt-Gardner to prepare to cross-examine the expert but did not know when she would be available.[16] And, as the court emphasized, appellant had made no disclosure about what a defense expert would be expected to say,[17] thus prejudicing the government.

Finally and most importantly, counsel did not give the trial court reason to think that the defense would be prejudiced by the court's denial of a continuance. As trial counsel explained, he sought to have an expert testify about the collection and preservation of evidence to be analyzed for DNA. Even though defense

---

[16] The prosecutor had explained to the court on January 22 that Borchardt-Gardner would be out of the jurisdiction and testifying elsewhere during the week of January 26.

[17] Appellant's reply brief asserts that it is reasonable to infer that the "Mitchum" to whom defense counsel referred during his colloquy with the court was J. Thomas McClintock, whom counsel had identified to the prosecutor in a January 12, 2015, email. However, in light of the minimal similarity beween the names, this assertion seems entirely speculative.

To this day, appellant has not described the expert's expected testimony.

counsel had questioned Borchardt-Gardner as if Officer Dega had placed the gun on the apartment's kitchen *table* as depicted in a defense exhibit, the answers he elicited from her made the point that counsel emphasized during closing argument: that the officer's placement of the gun on *any* kitchen surface set the stage for possible contamination through a secondary transfer of DNA from that surface to the gun. Defense counsel had also elicited Borchardt-Gardner's testimony that DNA could deteriorate in heat (enabling him to suggest to the jury that the officers' testimony, which supported an inference that the gun had probably been in Officer Dega's car for over an hour before being delivered to the police station, could explain why no one else's DNA was found on the gun).

It appears that none of this testimony gave the jury pause: they returned a unanimous verdict by 2:08 p.m., despite presumably having taken a lunch break after they began deliberating at 12:55 p.m. Although appellant does not say what else a defense expert might have established, we can say with fair assurance that the outcome was not "substantially swayed" by the trial court's ruling that trial would proceed, *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946), even assuming *arguendo* that it represented an erroneous exercise of discretion.

**V**.

As described above, the trial court sentenced appellant to the three-year minimum sentence mandated by District of Columbia law for a defendant convicted of unlawful possession of a firearm after a prior conviction for a crime of violence. *See* D.C. Code § 22-4503 (a), (b)(1) (2012 Repl.).[18] In his final argument, appellant contends that "the fact that [his] prior conviction [in 1999 for first-degree assault in Maryland] was for a crime of violence is . . . an element that needed to be found by the jury beyond a reasonable doubt." He argues that because the trial court rather than the jury made the crime-of-violence

---

[18] In pertinent part, § 22-4503 provides that:

> (a) No person shall own or keep a firearm, or have a firearm in his or her possession or under his or her control, within the District of Columbia, if the person:
>
> > (1) Has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year;
>
> . . .
>
> (b)(1) A person who violates subsection (a)(1) of this section shall be sentenced to imprisonment for not more than 10 years and shall be sentenced to imprisonment for a mandatory-minimum term of 1 year, unless she or he has a prior conviction for a crime of violence other than conspiracy, in which case she or he shall be sentenced to imprisonment for not more than 15 years and shall be sentenced to a mandatory-minimum term of 3 years.

determination, the court's imposition of the three-year mandatory minimum violated his constitutional rights. Alternatively, appellant argues, even if no constitutional violation occurred, the trial court plainly erred in concluding that his Maryland first-degree assault conviction is equivalent to an aggravated assault conviction in the District of Columbia.[19] For the reasons that follow, we disagree.

For his argument that the trial court's imposition of the three-year mandatory minimum term of imprisonment violated his constitutional rights, appellant relies on *Alleyne v. United States*, 133 S. Ct. 2151 (2013). The Supreme Court held in *Alleyne* that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." 133 S. Ct. at 2155. The Court reasoned that its holding was compelled by the holding of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which the *Alleyne* Court stated "applies with equal force to facts increasing the mandatory minimum." *Id.* at 2160. The *Apprendi* Court endorsed the rule that "facts that increase the prescribed range of penalties to which a criminal defendant is exposed," 530 U.S. at 490, "must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* The Court recognized an exception, however, for prior

---

[19] As his "plainly erred" argument reflects, appellant did not make this argument to the trial court. Indeed, trial counsel stated that he "[took the prosecutor] at his word that" the relevant Maryland and District of Columbia statutes overlapped.

convictions: it stated that "[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* (emphasis added); *see also Descamps v. United States*, 133 S. Ct. 2276, 2288 (2013); *Alleyne*, 133 S. Ct. at 2160 n.1 (observing that the Court has recognized "a narrow exception . . . for the fact of a prior conviction" (citing *Almendarez-Torres v. United States*, 523 U.S. 224 (1998)).[20]

Appellant does not contend that there was trial court error in recognizing *simpliciter* that he had a prior conviction (nor could he so contend in light of his stipulation and the jury finding, necessary for the UPF conviction, that he had a prior felony conviction). He asserts, however, that "the mere fact of a prior felony conviction" is different from a determination about "the nature of a prior

---

[20] In *Almendarez-Torres*, the Court considered a statute providing for an enhanced sentence for a deported alien who returns to the United States without special permission "if the initial deportation was subsequent to a conviction for commission of an aggravated felony." 523 U.S. at 226 (internal quotation marks omitted). The Court held that the provision "simply authorizes an enhanced sentence when an offender also has an earlier conviction," and thus the "fact of an earlier conviction [for an aggravated felony] is not an element of the present crime" that must be charged in the indictment. *Id.*

Even though the Supreme Court has at least twice questioned the continued validity of *Almendarez-Torres* (*see Apprendi*, 530 U.S. at 489–90 and *Alleyne*, 133 S. Ct. at 2160 n.1), the Court has not overruled it.

conviction" — here, a determination that appellant's prior conviction was for a crime of violence, a determination he argues was a jury question.

Appellant's argument presumes that the determination that he had a prior conviction for a crime of violence was a factual determination. We conclude that it was instead, as the trial court reasoned, a legal determination that was for the court to make, and that the court made correctly. We therefore reject appellant's assignments of error.

*Descamps* supports our conclusion that the trial court properly reserved to itself resolution of whether appellant's Maryland first-degree assault conviction was a conviction for a crime of violence. In *Descamps*, the Supreme Court considered an issue arising under the federal Armed Career Criminal Act (the "ACCA"), 18 U.S.C. § 924 (e) (2012). 133 S. Ct. at 2276. Pursuant to that statute, a district court's finding of a predicate prior offense that is a "violent felony" (a term that is defined to include "burglary" and a few other specified crimes) increases the maximum penalty for certain crimes. *Id.* The Court's unanimous opinion explains that under an approach known as the "categorical approach," the district court may implement the ACCA by "compar[ing] the elements of the statute forming the basis of the defendant's [prior] conviction with the elements of

the 'generic' crime" listed in the enhancement statute as a basis for enhancing the penalty. *Id.* at 2281; *see also id.* at 2288 (referring to the Court's "insistence on the categorical approach"). The district court may conclude that the prior conviction qualifies as a penalty-enhancing ACCA predicate offense if the predicate offense's elements are "the same as, or narrower than, those of the generic offense" listed in the enhancement statute. *Id.* at 2281. The Supreme Court acknowledged that it had also approved a "modified categorical approach," which the district court may use when the statute underlying the prior conviction is a "divisible statute," i.e., a statute that "sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building *or* an automobile." *Id.* As an example, the Court explained,

> If one alternative (say, a building) matches an element in the [penalty-enhancing] generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction.

*Id.* "The court can then do what the categorical approach demands: compare the elements of the crime of conviction (including the alternative element used in the case) with the elements of the [penalty-enhancing] generic crime." *Id.*

The *Descamps* Court also described what a district court may *not* do in implementing the ACCA. Citing *Apprendi*, the Court observed that an increased penalty based on a finding by the trial court would "raise serious Sixth Amendment concerns if [the court's task] went beyond merely identifying a prior conviction" and involved, for example, "mak[ing] a disputed determination about what the defendant and state judge must have understood as the factual basis of the . . . plea [underlying the prior conviction], or [about] what the jury in a prior trial must have accepted as the theory of the crime." *Id.* at 2288 (internal citation and quotation marks omitted). The Court therefore disapproved a Ninth Circuit opinion that "authorize[d] the [district] court to try to discern what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct," *id.*, because "[t]he Sixth Amendment contemplates that a jury—not a sentencing court—will find such facts, unanimously and beyond a reasonable doubt."[21] *Id.*

The significance of *Descamps* for the instant case is this: adhering to *Apprendi*, the Supreme Court implicitly recognized that if a court's determination that an increased penalty applies rests on nothing more than a legal analysis concluding that the elements of a prior, predicate crime match those of the type of

---

[21] The Court thus approved "an elements-based inquiry" but not "an evidence-based one . . . ." 133 S. Ct. at 2287.

offense that the penalty statute establishes as the trigger for the enhanced penalty (i.e., an elements-based inquiry), the court's determination is not the type of factual finding (if it is a "factual" finding at all)[22] that contravenes the rule of *Apprendi* and its progeny.

The trial court's determination here was just such a determination. The Maryland statute under which appellant was convicted, Md. Code Art. 27, § 12A-1 (1999) (repealed by Act of Oct. 1, 2002, ch. 26, sec. 2, § 3-202, 2002 Md. Laws 241) was a divisible statute. It provided that "[a] person may not intentionally cause or attempt to cause serious physical injury to another," Md. Code Art. 27, § 12A-1 (a)(1), and "may not commit an assault with a firearm,"[23] Md. Code Art. 27,

---

[22] The determination that appellant's Maryland conviction was for an offense whose elements match that of aggravated assault in the District is quite different from the factual finding that was at issue in *Alleyne*, for example. There, the trial court rather than the jury made a finding that Alleyene had "brandished" a firearm during a robbery. *See* 133 S. Ct. at 2155. That finding triggered a minimum sentence of seven years instead of the five years that would have applied if Alleyne had merely "carried" a firearm during the robbery. *Id.*

[23] The Maryland statute thus "'set[] out one or more elements of the offense in the alternative,'" making it appropriate for the trial court, if necessary, to "consider certain materials, such as charging documents and jury instructions, to determine which alternative element was the basis of the defendant's conviction." *Contreras v. United States*, 121 A.3d 1271, 1274 (D.C. 2015) (quoting *Descamps*, 133 S. Ct. at 2281). At sentencing in the instant case, the trial court appears to have focused only on the first alternative (although the prosecutor described both possible bases for the Maryland conviction), accepting the argument that the

(continued…)

§ 12A-1 (a)(2), and stated that "[a] person who violates this section is guilty of the felony of assault in the first degree," Md. Code Art. 27, § 12A-1 (b). The statute defines "serious physical injury" as that which "(1) [c]reates a substantial risk of death; (2) [c]auses serious permanent or serious protracted disfigurement; (3) [c]auses serious permanent or serious protracted loss of the function of any bodily member or organ; or (4) [c]auses serious permanent or serious protracted impairment of the function of any bodily member or organ." Md. Code Art. 27, § 12 (C).

Whether appellant was subject to the three-year mandatory minimum turned on whether his conviction under Md. Code, Art. 27, § 12A-1 was for a "crime of violence other than conspiracy . . . ." D.C. Code § 22-4503 (b)(1) (2012 Repl.). "[T]he term . . . '[c]rime of violence' shall have the same meaning as provided in § 23-1331 (4), or a crime under the laws of any other jurisdiction that involved conduct that would constitute a crime of violence if committed in the District of Columbia, or conduct that is substantially similar to that prosecuted as a crime of violence under the District of Columbia Official Code." D.C. Code § 22-4503

---

(…continued)
Maryland offense overlapped with aggravated assault. However, for the reason discussed in the text *infra*, both alternative bases for conviction under the Maryland statute overlapped with the definition of "crime of violence" in District of Columbia law.

(d)(1). In turn, D.C. Code § 23-1331 (4) defines "crime of violence" to include, *inter alia*, "aggravated assault," "assault with a dangerous weapon," and "an attempt . . . to commit any of the foregoing offenses." For a conviction of "aggravated assault" under District of Columbia law, it must be proven that the defendant "caused serious bodily injury to the victim . . . knowingly or purposely" or "[u]nder circumstances manifesting extreme indifference to human life, . . . intentionally or knowingly engage[d] in conduct which create[d] a grave risk of serious bodily injury to [the victim]." *In re D.P.*, 122 A.3d 903, 908 (D.C. 2015) (internal quotation marks omitted) (quoting D.C. Code § 22-404.01 (a)(2) (2012 Repl.)). "Serious bodily injury" is injury that "involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nixon v. United States*, 730 A.2d 145, 149 (D.C. 1999). A "dangerous weapon" is "one which is likely to produce death or great bodily injury by the use made of it." *Tuckson v. United States*, 77 A.3d 357, 361 (D.C. 2013) (internal quotation marks omitted).

From the foregoing discussion, it can be seen that appellant's conviction of first-degree assault in Maryland, which by law had to be premised on appellant's having caused or attempted to cause a substantial risk of death, serious and

protracted disfigurement, or protracted impairment of function *or* his commission of an assault with a firearm, would have constituted aggravated assault or assault with a dangerous weapon (or an attempt to commit one of these offenses), and thus a crime of violence, if committed in the District of Columbia.  At the very least, the trial court did not plainly err in so finding.  Although the District of Columbia definition of aggravated assault covers some resultant conditions (such as unconsciousness and extreme physical pain) that alone apparently would not have supported a first-degree assault conviction in Maryland, it seems clear as a matter of law that the conditions necessary to support the charge in Maryland all are subsumed within the scope of serious bodily injury necessary to support a D.C. conviction for aggravated assault.  And, since commission of an assault with a firearm, the other alternative basis for conviction under Md. Code Art. 27, § 12A-1, seems to be definitionally equivalent to assault with a dangerous weapon and thus also satisfied the definition of a "crime of violence" under  D.C. Code § 23-1331 (4), the trial court could properly make (and did make) the determination that appellant had a prior conviction for a "crime of violence" (which term includes, as the Maryland first-degree assault statute did, attempts to commit any of the foregoing offenses).  The court could do so without even needing to look to extra-statutory documents such as the Maryland charging documents or jury instructions

"to determine which alternative element was the basis of [appellant's] conviction." *Contreras*, 121 A.3d at 1274.

The jury properly had no role in the determination of whether the three-year mandatory minimum sentence applied because the determination was not premised on factual findings about (potentially disputed) matters such as exactly what acts appellant was found to have committed or what else the Maryland record might have established that was not necessary for the Maryland conviction.[24] We therefore reject appellant's challenges to the court's imposition of the three-year mandatory minimum sentence.

## VI.

For the foregoing reasons, the judgment is

*Affirmed.*

---

[24] We note, moreover, that, as we observed in *Eady v. United States*, "admission of evidence of the type of felony" appellant was convicted of in Maryland could have been "likely to support conviction [on the weapons charges appellant faced] on some improper ground." 44 A.3d 257, 263 (D.C. 2012) (internal quotation marks omitted).