**Robert A. LANE, Appellant,**

v.

**UNITED STATES, Appellee**

**Nos. 93–CF–495 and 97–CO–1843.**

District of Columbia Court of Appeals.

Argued Oct. 6, 1998.

Decided Sept. 9, 1999.

M. Elizabeth Kent, Washington, DC, appointed by the court, for appellant.

Arthur G. Wyatt, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, Thomas J. Tourish, Jr., Ronald L. Walutes, Carolyn K. Kolben, and Timothy J. Heaphy, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and BELSON, Senior Judge.

TERRY, Associate Judge.

Appellant Lane was convicted of kidnapping while armed,[1] first-degree felony murder while armed,[2] first-degree premeditated murder while armed,[3] possession of a firearm during a crime of violence,[4] and carrying a pistol without a license.[5] After he noted an appeal from the judgment of conviction, this court granted a stay of that appeal while Lane pursued a motion to vacate his sentence under D.C.Code § 23–110 (1996). The trial court denied that motion, and Lane noted a second appeal, which we consolidated with the first.

■ Lane contends that the trial court erred by failing to give sufficient consider-

1. D.C.Code §§ 22–2101 and 22–3202 (1996).

2. D.C.Code §§ 22–2401 and 22–3202 (1996).

3. D.C.Code §§ 22–2401 and 22–3202 (1996).

4. D.C.Code § 22–3204(b) (1996).

5. D.C.Code § 22–3204(a) (1996).

ation to a pre-trial claim of ineffective assistance of counsel and by denying without a hearing his § 23–110 motion, which was based on a claim of ineffective assistance of counsel during (rather than before) trial. We hold that the trial court adequately addressed the claims of ineffective assistance which Lane raised before trial, and that the remaining claims of ineffectiveness are without merit. Accordingly, we vacate as redundant one of the two murder convictions,[6] but otherwise affirm both the judgment of conviction and the denial of the § 23–110 motion.

I

A. *The Government's Evidence*

At around noon on October 28, 1991, Sean Boyce and some friends walked across the street from Roosevelt High School, where they were students, to get lunch at the Super S Carry–Out. One member of the group, Darryl Copeland, went inside while Boyce and two others, Curtis Grady and Rahman Mahdi, waited on the sidewalk near the entrance. As the three of them stood there, appellant Lane, accompanied by an unidentified man, approached Boyce and began talking with him. After they had spoken for several minutes, Boyce went with Lane and the other man into a nearby alley. Boyce and Lane walked side by side, followed by the third man. Lane was talking to Boyce, whose head was down.

After they entered the alley, another man approached Mahdi and spoke with him briefly. Following the conversation, Mahdi and Grady ran to a nearby car to get guns. They returned to the carry-out approximately fifteen minutes later, where Copeland joined them. Armed with their guns, the three of them entered the alley, only to find it empty. They never saw Boyce alive again.

Catherine Graham passed by the alley twice that afternoon. The first time, on her way to her mother's house, she saw a rust-colored station wagon pull up to the alley entrance. While the driver remained in the car with the motor running, two men got out and headed into the alley. About ten minutes later, after finding that her mother was not at home, Graham walked back past the same alley. The two men she had seen earlier came out of the alley with a third man, whom Graham later identified as Boyce.[7] He was walking between the other two, and the man on the right appeared to be holding a gun. All three were quiet as they came out of the alley, in contrast to the casual behavior which the two men had exhibited earlier when she saw them going into the alley. From their actions, Graham concluded that "something went down" and feared that she was "in the wrong place at the wrong time." The three men got into the waiting station wagon, which quickly drove off.

Less than an hour later, William Redman saw three young men sitting on a picnic bench in Fort Slocum Park, approximately two miles from Roosevelt High School. While Redman watched from the front of his apartment building approximately twenty yards away, one of the men got up from the bench, walked around the table, and shot one of the other men five to six times in the face at close range. The third man, who until then had remained seated, immediately ran from the scene

---

**6.** Lane was convicted of armed first-degree felony murder and armed first-degree premeditated murder, both involving the same victim. Under controlling precedent, however, one of these two convictions must be set aside. *See, e.g., Thacker v. United States,* 599 A.2d 52, 63 (D.C.1991) ("When there is only one killing, the defendant may not be convicted of more than one murder" (citation omitted)). Since the trial court imposed identical concurrent sentences of twenty years to life on each of the murder convictions, we vacate the conviction of felony murder while armed (count C of the indictment), leaving undisturbed the convictions of premeditated murder while armed (count D) and armed kidnapping (count B).

**7.** Graham was approximately ten feet away when she saw the men coming out of the alley.

and disappeared into a nearby alley. The gunman, whom Redman identified as appellant Lane,[8] ran toward Redman, saw him, and then turned and ran down the alley into which his companion had fled. Moments later, Redman saw a brown station wagon drive slowly through the area as if it were "looking for the guys to come jump in." Sean Boyce, the victim of the shooting, died before the police arrived.

Two days after Boyce's murder, Lane confessed to his girl friend, Corine Ward, that he had killed Boyce. Ward said that when Lane came to her house, she asked him if he had heard about the shooting, and Lane responded in a serious tone, "Yes, I did it." Ward testified that she did not think Lane was joking.

Lane also confessed to his cousin, James Thomas. In the weeks following the shooting, Lane shared a room with Thomas in the home of Thomas' mother in Capitol Heights, Maryland. At some time during that period Thomas heard that Lane was "in some sort of trouble." When Thomas asked him about it, Lane confessed that "he had shot someone ... over a jealousy-type thing." Lane explained to his cousin that he had taken someone from a school and shot him. He asked Thomas not to tell his mother and promised to turn himself in after Christmas.

### B. *The Defense Evidence*

Lane testified that he spent the entire month of October 1991[9] in the hospital after having been shot sixteen times. As a result of his injuries, he said, he was not capable of running at the time Boyce was shot. He acknowledged, however, that he knew Boyce through "drug transactions." When his counsel asked who had shot him, Lane replied, "I don't really know, but [it was] supposed to have been guys that [were] with Sean Boyce."

Lane admitted that on the day Boyce was shot he had gone to Roosevelt High School looking for a female friend named Shawnee. As he approached the school, he noticed Boyce "hanging out" with a group of people in front of the Super S Carry–Out, so he asked Boyce if he had seen Shawnee. Boyce replied that she was inside the school building. Lane and Boyce also discussed the recent incident in which Lane had been shot. However, Lane did not ask whether Boyce was involved because he was afraid Boyce might think he was attempting retaliation and "come back at" him again.

While Lane and Boyce talked, they headed down the street toward Roosevelt High School. As they were walking, Lane said, "a guy came out from behind, pulled a gun, and ... said, 'You gotta walk with me.'" Lane could not identify this person "because it was lunch time and ... everybody was out there." Lane then had a "flashback" and hoped that Boyce was not responsible for what was happening, though he feared that Boyce might have planned to have him shot again. When they reached the end of the alley, the man with the gun told Lane to "step off." Boyce and the gunman then got into a car and left. Lane testified that he then went back to his own car and drove to the home of his friend Christine Blake. He denied that he was ever at Fort Slocum Park that afternoon and denied shooting Boyce.

Although Lane also denied confessing to the shooting, he admitted that he had discussed Boyce's death with Corine Ward. He testified that when he visited Ward at her house, Ward told him that he had been identified in the Washington Times as a suspect in Boyce's murder. According to Lane, when Ward asked him if he knew who shot Boyce, he told her that he did not know. Despite his response, Ward encouraged him to turn himself in. Ward

---

8. Redman had known Lane for about five or six years before that afternoon. As he fled from the scene of the shooting, Lane passed within ten yards of Redman.

9. Boyce's murder occurred on October 28.

also told him that she had heard someone else express the belief that Lane had killed Boyce, but she herself did not think he had done it.

Lane acknowledged that he had also discussed Boyce's shooting with his cousin, James Thomas. He testified that he showed Thomas his picture in the Washington Times and asked Thomas not to tell his mother that he was a suspect in a murder. He explained to Thomas that he had been with Boyce at Roosevelt High School on the afternoon Boyce was killed and that "somebody came and snatched" Boyce while the two of them were talking. Lane added that "they think that it was somebody that was involved with me or somebody that I [was] with, and that they think I killed him." However, he denied confessing to Thomas that he had abducted and killed Boyce.

On cross-examination, Lane testified that "Kevin," "Doc Lattimore," and "John John" had informed him that Boyce was involved in his shooting. When they told him this, however, Lane responded that he was "not going initiating no beef" because he did not know that Boyce "directly shot [him]." Lane said that he and Boyce were "always all right" and "had no dispute over nothing," not even during their "drug dealings." Moreover, Lane said that he was not angry after he was shot, but simply thankful to be alive.

Another of his cousins, Evelyn Clark–Benton, corroborated Lane's testimony that in the late summer and early fall Lane was in the hospital recovering from an incident in which he had been shot sixteen times.

## II

■ Although originally scheduled to begin on September 4, 1992, Lane's trial was continued at the request of defense counsel until January 6, 1993. On January 4 defense counsel filed another motion for a continuance, which the trial judge heard on the morning of January 6, just before the trial was scheduled to begin. In an *ex parte* bench conference, counsel explained to the court that he needed additional time to prepare Lane's defense. He said that "since the initial interview" Lane had "changed his position" on certain statements he had made. Specifically, counsel was concerned that Lane had "previously made statements of participation ... to government witnesses" and requested additional time so that he could "encourage [his] client to discuss his defense" with him. Counsel revealed that he had met with Lane only twice since the originally scheduled trial date in September, for a total of about five hours, and that he had been "absorbed" in two other lengthy trials during the preceding two months. Nevertheless, despite counsel's concerns, the court denied the motion for a continuance and ordered the case to trial, instructing counsel to "devote some intense efforts with Mr. Lane to prepare for trial."

After a break, defense counsel renewed his motion for a continuance in open court:

I believe that the status of the defense at this posture is such that I cannot effectively represent my client. If the court believes that the interest of justice requires that this matter proceed to trial today, I would just state for the record that I will do my best efforts to ... zealously attempt to defend him, but I again indicate to the court that there are some communication difficulties with my client which suggest to this attorney that he is not effectively assisting counsel in the defense.

Counsel said that the communication problem stemmed from Lane's view of him as an "establishment figure" and appeared to be "a product of [Lane's] own suspicions with regard to court personnel." Despite counsel's efforts, Lane continued to withhold from him "information ... which would be very useful to counsel in trying the case." Counsel felt that if he had more time to discuss the case with Lane, he could "develop" the degree of "confi-

dence" which should exist between attorney and client.

In response to counsel's concerns, the trial judge asked Lane whether his counsel had failed to do anything Lane had asked him to do, to which Lane responded, "No, sir." The judge concluded:

> This matter has been pending since December of 1991. It's up to Mr. Lane in his own mind to decide whether or not he wants to trust you to work in his best interest or not.
>
> I'm not convinced that one more day or thirty more days will help Mr. Lane trust you any more than he does right now. He's indicated to me—and I appreciate it—that there's nothing that he's asked you to do that you haven't done.
>
> I don't have any indication that you have been ineffective in any way. There's just no need for a continuance.

The trial began the next morning.

On appeal, Lane argues that the trial court's inquiry into the pre-trial claim of ineffective assistance of counsel was insufficient under the guidelines established by this court in a line of cases beginning with *Monroe v. United States,* 389 A.2d 811, 820 (D.C.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978), and *Farrell v. United States,* 391 A.2d 755 (D.C.1978). Specifically, Lane claims that the court erred in not sufficiently questioning defense counsel "about his theory of the case, his efforts to locate and interview witnesses, or the number and extent of his conferences with the [appellant]." We disagree, for we are satisfied that the court obtained during the *ex parte* bench conference all the information it needed to rule on the ineffectiveness claim.

 In *Monroe* we held that when a defendant makes a pre-trial claim of inef-

fective assistance of counsel "due to lack of investigation, preparation, or other substantial reason," the trial court has a "duty to conduct an inquiry sufficient to determine the truth and scope of the defendant's allegations." 389 A.2d at 820 (citations omitted); *accord, Farrell,* 391 A.2d at 760–761. Because the scope of the hearing depends on the nature of the case and the alleged deficiencies, "the exact nature of the inquiry is within the trial court's discretion." *Nelson v. United States,* 601 A.2d 582, 592 (D.C.1991). Therefore, although "the trial court must put to defense counsel (and to the defendant, if necessary)—*on the record*—specific questions designed to elicit whether or not the ... criteria of professional competence have been met," *Monroe,* 389 A.2d at 821 (emphasis in original), the court need not attempt to examine every conceivable deficiency in the representation. Once it has addressed the defendant's specific complaints, the court has "no basis ... to inquire further into the attorney-client relationship or about defense counsel's preparation for trial." *Gordon v. United States,* 582 A.2d 944, 946 (D.C.1990); *accord, e.g., Wingate v. United States,* 669 A.2d 1275, 1281 (D.C.1995) ("the substance of the complaints about counsel's performance governs the nature of the mandated inquiry" (citations omitted)).

In the present case Lane did not raise a pure *Monroe–Farrell* issue; rather, his pre-trial claim of ineffective assistance, such as it was, arose in the context of a motion for a continuance. During an *ex parte* bench conference, defense counsel explained to the trial judge that his schedule and Lane's reluctance to cooperate had prevented him from investigating and preparing all possible defenses. After exploring and weighing counsel's concerns, the judge denied the motion.[10] Once back in open court, defense counsel renewed his

---

10. Lane does not claim error in the denial of the motion for a continuance. Moreover, had he done so, we would not reverse absent a clear showing of abuse of discretion. *Bedney v. United States,* 684 A.2d 759, 766 (D.C. 1996); *Rymer v. Pool,* 618 A.2d 165, 167 (D.C.1992). We find nothing in the record to suggest that the trial judge abused his discretion in denying the motion.

motion, asserting only that he could not effectively represent his client based on "those representations [he] previously made at the bench." Counsel did not raise any new complaints about his preparation or any other facet of his representation; the trial judge was presented only with those matters that had been raised, discussed, and rejected during the bench conference.[11] Since he had already addressed the particular claims of ineffectiveness at length and provided defense counsel "a full opportunity to advise the court of any concerns," *Gordon,* 582 A.2d at 946, the judge had no reason to probe further into counsel's preparation for trial. In addition, although he was directly asked, Lane himself raised no additional complaints about his counsel's representation that might have warranted further inquiry by the trial judge; to the contrary, Lane indicated that he was generally satisfied with his counsel.[12] *See id.* The trial judge therefore had no basis on which to conduct a further inquiry, and we cannot find fault with his decision not to do so.

### III

In his motion under D.C.Code § 23–110, Lane based his claim of ineffective assistance on several alleged deficiencies by his trial counsel. The court denied the motion without a hearing. Lane now maintains that the court erred, both in failing to hold a hearing and in denying the motion on the merits. ·

When a defendant in a § 23–110 motion raises a claim of ineffective assistance of counsel, there is a presumption that the trial court should conduct a hearing. *Newman v. United States,* 705 A.2d 246, 261 (D.C.1997); *Gray v. United States,* 617 A.2d 521, 523 (D.C.1992); *Sykes v. United States,* 585 A.2d 1335, 1339 (D.C.1991). "The basis for the presumption is in the language of the statute itself." *Gray,* 617 A.2d at 523. The presumption is even stronger when the claim of ineffectiveness is based on facts that are not already disclosed in the record. *Newman,* 705 A.2d at 261. Nevertheless, the burden is always on the movant "to allege facts which, if demonstrated, would establish ineffective assistance of counsel." *Johnson v. United States,* 385 A.2d 742, 744 (D.C.1978) (footnote omitted).

Despite the presumption, a hearing is not required in every case, and we review a trial court's decision not to hold one only for abuse of discretion. *Sykes,* 585 A.2d at 1340. "Where the existing record provides an adequate basis for disposing of the motion, the trial court may rule on the motion without holding an evidentiary hearing." *Ready v. United States,* 620 A.2d 233, 234 (D.C.1993). This court has recognized that a hearing is un-

---

**11.** The bench conference between the judge and defense counsel was recorded on tape rather than transcribed by a court reporter; as a result, several words and phrases were not preserved because they were indiscernible on the tape. We are thus presented with an incomplete record of that discussion. As we noted in *Monroe,* one of the primary reasons for conducting *Monroe–Farrell* inquiries is to develop a record "sufficient to permit meaningful appellate review on the issue of the ability and preparedness of counsel to render effective assistance under the prevailing circumstances." 601 A.2d at 592. We therefore observe that a tape recording may not be the best means of creating a record, and we urge the trial court to make sure that a court reporter takes notes of all bench conferences, even when one party is not included. In this case, nevertheless, from the limited transcript before us, we are satisfied that the trial judge here adequately addressed counsel's concerns.

**12.** Our conclusion is supported by later developments. Defense counsel's affidavit, filed in the § 23–110 proceeding, recites the numerous steps he took to prepare the case: meeting with his client prior to trial (even though Lane would only briefly outline the facts of the case and gave conflicting alibis), discussing and investigating possible alibis, obtaining reports, visiting the crime scene and canvassing it, interviewing available witnesses, and discussing trial strategy with Lane. These uncontradicted statements indicate that defense counsel's pre-trial preparation met the standards established by our case law.

necessary when the motion contains only "(1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Dobson v. United States*, 711 A.2d 78, 83 (D.C.1998); *accord, e.g., Ready*, 620 A.2d at 234; *Gray*, 617 A.2d at 523; *Ramsey v. United States*, 569 A.2d 142, 147 (D.C.1990).

To prevail on his claim of ineffective assistance, Lane must demonstrate that his attorney's representation "fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 694, 104 S.Ct. 2052. "Judicial scrutiny of counsel's performance must be highly deferential ... [and] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...." *Id.* at 689, 104 S.Ct. 2052. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. Applying this standard to the present case, we conclude that the trial court properly denied the motion without a hearing. The majority of Lane's claims of ineffectiveness can be rejected solely on the existing record. Those that arguably implicate information outside the record are vague and conclusory and thus do not warrant a hearing.

■ In his effort to show deficient performance, Lane first argues that his trial counsel provided the prosecution with a motive for the murder in the form of drug and gang evidence. Prior to *voir dire*, the prosecutor told the court that the government did not have any concrete proof that Boyce's murder was gang-related or drug-related and that he did not plan to introduce any evidence to that effect. Nevertheless, in his opening statement, defense counsel portrayed the decedent as a drug dealer. In addition, counsel elicited testimony from Lane that he had known Boyce through "drug transactions." Lane argues that counsel's actions prejudiced his case and constituted ineffectiveness.

■ Despite the negative impact that evidence of involvement in drugs and gangs generally has on defendants, defense counsel's introduction of such evidence does not, by itself, demonstrate deficient representation. In his affidavit, which accompanied the government's response to Lane's § 23–110 motion, defense counsel disclosed that he had introduced evidence that the decedent was a drug dealer to contradict the government's portrayal of him as a student and good citizen. While such evidence may arguably have been more damaging than beneficial to Lane, "[m]ere errors of judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness." *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985). Counsel's decision to elicit evidence of drug and gang involvement was a legitimate and permissible trial strategy. Courts are loath to second-guess such decisions on the basis of hindsight, as Lane urges us to do. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

■ We find equally unpersuasive Lane's claim that counsel was ineffective because he did not impeach James Thomas, Lane's cousin, with an out-of-court recantation of his trial testimony. At trial Thomas testified that Lane confessed to him that he had taken someone from a school and shot him. After Thomas left the stand, another cousin, Evelyn Clark–Benton, disclosed to counsel that Thomas had told her, both before and after he testified, that Lane never confessed to him. Although defense counsel, during his direct examination of Clark–Benton, unsuccessfully attempted to introduce Thomas' conflicting statements, he made no effort to recall Thomas to the stand and ask

him about the alleged recantation or otherwise to highlight for the jury the supposed inconsistencies between Thomas' testimony and his out-of-court statements to Clark–Benton.

While impeaching a damaging witness such as Thomas is often sound practice, defense counsel's choice not to pursue the matter in these circumstances certainly does not rise to the level of ineffectiveness. Counsel was faced with Thomas' grand jury testimony, which was essentially the same as his trial testimony, and with his bias in favor of Lane. As the trial court noted in its order denying the § 23–110 motion:

> Mr. Thomas testified about the defendant's confession as a witness biased *not* toward the government, but instead to the defense. Since he was defendant's cousin and had a long, close relationship with defendant, Mr. Thomas' damaging testimony was highly credible. Mr. Thomas had no incentive to testify about the confession, although he had every reason to lie about the confession because it incriminated a close relative. [Emphasis in original.]

In this context, the trial court concluded that defense counsel's failure to elicit Thomas' inconsistent statements was a reasonable exercise of trial strategy rather than an error in judgment. We find no ground for reversal here. Furthermore, even assuming that the strategy was not reasonable, the potential prejudice to the defense was slight, given the corroborating grand jury testimony and Thomas' relationship with Lane.[13]

▆▆ Lane speculates that William Redman, another government witness, was biased against him and faults his attorney for not trying to expose that potential bias on cross-examination. To support this argument, Lane points out that William Redman is the brother of Tanya Redman. In an unsworn, handwritten "statement" attached to his § 23–110 motion, Lane recalled seeing Tanya Redman and Sean Boyce "together a long time before [Boyce] got killed" and inferred from this fact that the two of them "used to date." He also asserted that he and Tanya Redman did not get along because of a "personality conflict." From all of these facts he "made the connection: Tanya Redman put William Redman up to lying about me and framing me for the murder of Sean Boyce, which I did not commit." Lane said that when he saw Tanya Redman in the courtroom while William Redman was on the stand, he immediately disclosed this "connection" to his attorney, but the attorney "just told me to be quiet [and] never did anything about it." Specifically, Lane stated:

> William Redman was never cross-examined about his potential bias against me based on his relation to Tanya Redman (who was giving me the finger during trial), and her relationship with Sean Boyce and her dislike for me personally.

Lane now claims that counsel's failure to follow up on this hunch amounts to ineffectiveness. We cannot agree.

Lane's claim of potential bias is vague and conclusory. We fail to see how Tanya Redman's possible prior relationship with Sean Boyce would impel her to put pressure on her brother to commit perjury in order to convict the wrong person. Nor can we accept the notion that mere animosity between Lane and Tanya Redman would induce William Redman to lie. Moreover, defense counsel was not made aware of these relationships until almost the end of the trial, while William Redman was testifying. His decision not to pursue such a speculative and attenuated claim of bias cannot, on this record, be regarded as ineffective assistance; rather, it strikes us as a reasonable and intelligent allocation of

---

**13.** Defense counsel likewise made a tactical decision to elicit testimony from Thomas that he believed he and his family were in danger because Lane was living at their house. Counsel felt he could not let Thomas' "extremely damaging" testimony go unchallenged and therefore attempted to challenge Thomas' "credibility on the basis of bias."

counsel's limited time under the pressures of a trial. Moreover, aside from the fact that Lane's claims were vague and conclusory, a hearing on his motion was unnecessary because, even if William Redman was biased, Lane would not be entitled to relief. *See Dobson,* 711 A.2d at 83. A § 23–110 hearing provides the petitioner an opportunity to present evidence to prove the allegations in the motion. Because we conclude that defense counsel was not deficient in failing to explore William Redman's possible bias when it was brought to his attention during the trial, proof that Redman was in fact biased would not entitle Lane to have his conviction set aside.

▮▮▮▮ Lane's remaining assertions of deficient representation are similarly meritless. As we have already pointed out, defense counsel's statements to the court that he was not prepared to go to trial were belied by his later affidavit, in which he recited the numerous steps he had taken in preparation for trial. Moreover, those pre-trial statements alone would not be enough to support a claim of ineffective assistance. Lane must identify specific "acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Lane's own testimony at trial, while admittedly rambling and damaging to his defense, does not constitute such an act or omission. Sometimes witnesses provide damaging testimony despite thorough preparation by counsel. Defense counsel's uncontroverted affidavit established that he met with Lane on numerous occasions to prepare his testimony and to discuss impeachment and cross-examination. Lane claims that the preparation was inadequate, but he fails to support that claim with specific facts.

▮▮▮▮ Furthermore, even assuming that defense counsel's representation was arguably deficient in some respects, Lane did not make the showing of prejudice required by *Strickland.* The case against Lane was very strong. The trial judge characterized the government's evidence as "overwhelming" and noted that it included:

(1) the testimony of two witnesses who saw defendant lead the murder victim away from them into an alley and who never saw the murder victim alive again after this event;

(2) the testimony of a witness who saw the defendant leading the murder victim out of the same alley with another person and place him into a waiting car;

(3) the testimony of a witness who saw the defendant shoot the murder victim at point blank range; and

(4) two government witnesses who heard the defendant confess to the crime.

The likelihood that such a strong case would be affected by deficiencies in representation is significantly less than it would be if the conviction were only weakly supported by the evidence. *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. In this case there is no indication that Lane was in any way prejudiced by any asserted shortcomings in his counsel's representation at trial. We agree with the trial court's comment near the end of its order:

To warrant relief, defendant's arguments for a new trial would require a conclusion that his proffered evidence might have overcome all of the eyewitness testimony and the defendant's confession to Ms. Ward. Such a conclusion is not supported by the underlying record. The second requirement of *Strickland* remains unsatisfied.

### IV

We hold that the trial court adequately addressed those claims of ineffective assistance which defense counsel raised prior to trial, and that the court was not required by the *Monroe–Farrell* line of cases to probe further in an effort to find out whether there were any other potential deficiencies. We further hold that several

of the claims of ineffectiveness which Lane raised in his § 23–110 motion could properly be denied on the existing record, and that the rest were so vague and conclusory that they did not warrant a hearing. Accordingly, except for the conviction of first-degree felony murder while armed (count C), which is vacated as redundant (see note 6, *supra* ), the judgment of conviction and the denial of the § 23–110 motion are both affirmed.

*Affirmed in part, vacated in part.*