*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CO-654

JAMES J. DORSEY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-9678-13)

(Hon. Anita Josey-Herring, Motion Judge)

(Argued February 26, 2019     Decided February 27, 2020)

*Mindy Daniels* for appellant.

*Steven B. Snyder*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Matthew P. Massey*, and *William Schurmann*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and FERREN, *Senior Judge*.

THOMPSON, *Associate Judge*: Appellant James Dorsey appeals from the trial court's denial, without a hearing, of his motion brought pursuant to D.C. Code § 23-110 (2012 Repl.), claiming ineffective assistance of trial counsel. We remand for a hearing.

**I.**

On June 7, 2013, Metropolitan Police Department officers executed a search warrant at an apartment (Apartment 31) located at 4701 Alabama Avenue, S.E., and found a .357 Magnum revolver located on the top shelf inside a cabinet in the apartment's kitchen. *See Dorsey v. United States* ("*Dorsey I*"), 154 A.3d 106, 110-11 (D.C. 2017). One of the officers later testified that as the officers were entering the apartment, he noticed appellant — who had been standing on the balcony of the apartment when officers arrived in the parking lot, but entered the apartment when he saw the officers approaching the building — "exiting the kitchen area" where the gun was found. *Id.* at 110-11. The government charged appellant with unlawful possession of a firearm ("UPF"), unlawful possession of ammunition ("UA"), and possession of an unregistered firearm ("UF"). A jury convicted him of all three charges, and this court affirmed his convictions. *Id.* at 110.

While appellant's direct appeal was pending, appellant filed through counsel a "Motion to Vacate Sentence, Set Aside Judgment, and Grant a New Trial Pursuant to D.C. Code § 23-110." In his motion, appellant argued first that his trial

counsel, Raymond Jones, provided constitutionally ineffective assistance by failing to seek a voucher to pay for a DNA expert, failing to file an expert notice that was compliant with Super. Ct. Crim. R. 16, and failing to consult with a DNA expert or present expert DNA testimony (including testimony about the possibility that appellant's DNA could have been deposited on the gun without appellant's having ever touched the gun). Appellant also argued that his counsel provided deficient representation by failing to cross-examine the government's DNA expert concerning her romantic relationship with an Assistant U.S. Attorney; failing to interview and present the testimony of appellant's wife and son, who were in the apartment at the time of the search; and failing to seek suppression of the evidence (including most prominently the gun) retrieved during the search of the apartment. This appeal followed upon the trial court's June 7, 2017, order ("Order") denying appellant's motion without a hearing.

## II.

To prevail on an ineffective-assistance-of-counsel claim, a defendant "must demonstrate both that his counsel's performance was constitutionally deficient, and that the deficient performance prejudiced his defense." *Bost v. United States*, 178 A.3d 1156, 1210 (D.C. 2018) (internal quotation marks and brackets omitted)

(citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). As to the deficiency prong, "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney[,]" and "there is no expectation that competent counsel will be a flawless strategist or tactician[.]" *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (internal quotation marks omitted). As to the prejudice prong, the defendant's burden is to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Copeland v. United States*, 111 A.3d 627, 630 (D.C. 2015) (internal quotation marks omitted). For the defendant to be entitled to relief, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *see also id.* at 111 (explaining that "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." (citations omitted)).

Failure to show "either deficient performance *or* sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700 (emphasis added). Accordingly, it is not always necessary to evaluate both the performance and the prejudice prongs of an ineffective-assistance-of-counsel claim; "[i]f it is easier to

dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.* at 697. In our review of a trial court's denial of an ineffective-assistance-of-counsel claim, "we accept the trial court's findings of fact unless they lack evidentiary support in the record[,]" but "[o]ur review of the trial court's legal determinations, including its conclusions with respect to deficient performance and prejudice, is *de novo*." *Blakeney v. United States*, 77 A.3d 328, 341 (D.C. 2013).

"Ordinarily, there is a presumption in favor of holding a hearing on a § 23-110 motion asserting a claim of ineffective assistance of counsel." *Little v. United States*, 748 A.2d 920, 922 (D.C. 2000). Echoing the language of the statute, *see* D.C. Code § 23-110(c) ("Unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall . . . grant a prompt hearing thereon"), we have said that a hearing is not required when the motion is "capable of resolution on the existing record[.]" *Fields v. United States*, 698 A.2d 485, 489 (D.C. 1997). In particular, "a hearing on a § 23-110 motion is not necessary when the motion consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true." *Id.* (internal quotation marks omitted). "Although we review the trial judge's denial, without a hearing, of [a] motion pursuant to D.C. Code § 23-110,

for abuse of discretion, we must be satisfied that under no circumstances could the [appellant] establish facts warranting relief." *Steward v. United States*, 927 A.2d 1081, 1087 (D.C. 2007) (internal quotation marks and citation omitted). "Any question regarding the appropriateness of a hearing on a § 23-110 motion should be resolved in favor of holding a hearing[.]" *Brown v. United States*, 181 A.3d 164, 171 (D.C. 2018) (internal quotation marks and brackets omitted).

## III.

As we recounted in *Dorsey I*, one of the government's witnesses at trial was Andrea Borchardt-Gardner, a DNA analyst with Bode Technology Group, who testified that she was able to develop a partial DNA profile (i.e., eight of the fifteen locations that would constitute a full profile) from the biological material collected from a swab of the gun police recovered. *Dorsey I*, 154 A.3d at 111. Ms. Borchardt-Gardner determined that the profile was from a single, male contributor.[1] *Id.* She testified that she compared that profile with appellant's known DNA profile and found that "every allele [she] detected in the evidence

_____

[1] Ms. Borchardt-Gardner stated that the amount of DNA obtained from the gun was "approximately one quarter of the amount that we would ideally want to produce a robust profile." *Dorsey I*, 154 A.3d at 111 n.5 (internal quotation marks omitted).

sample was consistent with [appellant]." *Id.* She concluded that appellant "could not be excluded as a possible contributor of the partial DNA profile recovered from the gun." *Id.* She further "determined that the probability of randomly selecting another individual unrelated to appellant with the same partial DNA profile as the one recovered from the gun was one in 290 billion in the U.S. Caucasian population, one in eleven billion in the U.S. African-American population, and one in 52 billion in the U.S. Hispanic population." *Id.*

The government's witnesses also included a crime scene technician, Officer Mark Dega, who testified that he eventually placed the gun officers had recovered on a kitchen countertop to photograph it.[2] *Id.* Anticipating that testimony, defense counsel Jones cross-examined Ms. Borchardt-Gardner about "secondary transfer." Ms. Borchardt-Gardner acknowledged that she had "read a scholarly article about the secondary transfer of skin cell DNA (e.g., the transfer of DNA from skin cells present on an object to another object when the two objects touch)," but had never encountered such a transfer in her own experience as a supervising and senior DNA forensic analyst. *Id.* She testified that she "would be surprised to see DNA transferred in that manner . . . ."

---

[2] The crime scene technician also testified that he placed the gun into a paper bag for transmission to the police station. *Dorsey I*, 154 A.3d at 111.

Appellant contended in his § 23-110 motion that Mr. Jones provided constitutionally ineffective representation in that he failed to timely procure and give Rule 16 notice of a defense DNA expert who could more forcefully have presented appellant's secondary (or tertiary) transfer and cross-contamination theories, and could thereby have caused jurors to have reasonable doubt about whether the presence of appellant's DNA on the gun meant that he had touched and possessed the gun. Appellant asserts that a remand is necessary so that the trial court can hear testimony from a defense DNA expert.

Courts have recognized that whether to call an expert is fundamentally a strategic choice to be made by an attorney, the decision on which — either way — may fall within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. As the Supreme Court has explained, *Strickland* does not "requir[e] for every prosecution expert an equal and opposite expert from the defense"; rather, "[i]n many instances[,] cross-examination [of the opponent's expert] will be sufficient to expose defects in an expert's presentation." *Harrington*, 562 U.S. at 111. "When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the [government's] theory for a jury to convict." *Id.* The proposition that a trial

counsel need not introduce expert testimony on his client's behalf "if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony" is consistent with "the standards set forth in *Strickland*[.]" *Reinert v. Larkins*, 379 F.3d 76, 95 (3d Cir. 2004).[3]

In considering whether Mr. Jones's various omissions with regard to a defense DNA expert fell within the wide range of reasonable professional assistance, we consider the following facts: On January 26, 2015, at the conclusion of the government's case, Mr. Jones announced his intent to call an expert witness "to clear up some DNA matters . . . ." The prosecutor then pointed out, and Mr. Jones acknowledged, that the defense had failed to make the necessary Super. Ct. Crim. R. 16(b)(1)(C) disclosure setting out the basis of the expert's opinion. Mr. Jones, who was appellant's retained counsel, then made statements apprising the court that appellant had decided to forgo having his own expert because of the expense, and had done so even though counsel believed he needed an expert, had "always told [appellant] that he needed an expert witness[,]"

---

[3] *But see Benn v. United States*, 978 A.2d 1257, 1280 (D.C. 2009) (stating that cross-examination "is not necessarily a satisfactory alternative [to presenting expert testimony]; the efficacy of cross-examination must be evaluated with care in the context of the particular case and against the value added to the jury of proffered expert testimony").

and had offered to pay half the fee for the expert. The trial court credited Mr. Jones's statement that he "initially was planning to call a DNA expert and ultimately decided after speaking with Mr. Dorsey that he would not."

Although the trial court admonished that the defense had not complied with Rule 16, the court stated that it would permit a defense expert to testify the next morning if the defense could give the government notice by that night "about what the expert is going to testify about" and "the basis for the expert's opinion." The next day, Mr. Jones reported to the court that the DNA experts he had contacted were unavailable that day but could come the following day. The trial judge noted for the record that she had sent a notice to Mr. Jones of the court's willingness, "based on some comments that [the court] heard about . . . the lack of funds and how that potentially impacted the issue of the DNA expert[,]" to sign a voucher "for Mr. Dorsey so that he could have a DNA expert[,]"[4] but then remarked that

---

[4] This history causes us to repeat what we said in *Kigozi v. United States*, 55 A.3d 643 (D.C. 2012): "[A]ssuming (as counsel believed) that appellant was financially unable to pay for the expert he requested, counsel should have at least inquired whether the court would authorize counsel to obtain the services because they were necessary for an adequate defense." *Id.* at 652 n.11 (internal quotation marks omitted). *See also Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (reviewing trial counsel's failure to ascertain that more court-voucher funds were available to him than he thought were available, and holding that "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform

(continued…)

the problem "seems to be an availability issue[,]" rather than a financial one. The judge brought the matter to closure by stating that the court would move forward with the trial without a defense expert.

In short, although we acknowledge that the evidence regarding whether Mr. Dorsey's trial counsel provided constitutionally ineffective assistance with respect to procuring a defense expert is not entirely one-sided,[5] the record essentially supports appellant's assertion that counsel failed to arrange for the DNA expert assistance that he viewed as "necessary to Mr. Dorsey's defense[.]" We are satisfied that on the deficient-representation prong of the *Strickland* analysis, no hearing was necessary, because the claim "can[] be disposed of by resort to the files and records of the case[.]" *Ellerbe v. United States*, 545 A.2d 1197, 1199

---

(…continued)
basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

[5] We note, for example, that during a sealed bench conference, Mr. Jones explained to the court that, through his cross-examination of Ms. Borchardt-Gardner, the jury had already "heard three different ways of transfer[,]" and that he believed that if they heard "five, six, seven different theories, that's too much information . . . ." The court commented that counsel saw himself as "making some strategic decisions in this case in light of other testimony[.]" We likewise do not overlook that, in Mr. Jones's shifting assessments of what was necessary to counter the government's DNA evidence, he made some strategic choices that we should be "loath to second-guess[.]" *Lane v. United States*, 737 A.2d 541, 549 (D.C. 1999).

(D.C. 1988). The more difficult issue is whether Mr. Dorsey was entitled to a hearing on the prejudice prong of his claim.

Through cross-examination, Mr. Jones was able to get Ms. Borchardt-Gardner to explain the secondary transfer/DNA contamination points counsel wanted the jury to hear. Although she disclaimed experience with secondary transfer of skin cell DNA, Mr. Jones elicited her testimony as follows:

> It's possible that . . . if there was DNA, a good amount of DNA present on the table that it could transfer to the firearm. If that happened prior to collection, it's possible that a small amount of DNA might then be detected on the firearm without somebody having handled it themselves.

Mr. Jones highlighted that testimony during his closing argument, reminding the jury that Ms. Borchardt-Gardner "said that object to object transfer is possible." Mr. Jones also elicited Ms. Borchardt-Gardner's agreement that "DNA can degrade . . . depending on how it's stored" and "if [a] police officer took the gun, the evidence[,] inside of their car on a hot day, that [heat] could degrade the DNA." As we explained in *Dorsey I*, this testimony "enabl[ed] [Mr. Jones] to suggest to the jury that the officers' testimony, which supported an inference that the gun had probably been in Officer Dega's car for over an hour before being delivered to the police station, could explain why no one else's DNA was found on

the gun . . . ." 154 A.3d at 121-22. Given these points, we well understand the trial court's assessment that because Mr. Jones's cross-examination of Ms. Borchardt-Gardner "sufficiently elicited answers advancing [d]efense [c]ounsel's theory of indirect DNA transfer, as well as other potential weaknesses of the DNA results," "Mr. Jones'[s] actions [or inaction] did not prejudice [appellant]." Order at 3.[6]

We can also understand why the expert report that Mr. Dorsey attached to his § 23-110 motion did not, in the trial court's view, undermine that conclusion or entitle Mr. Dorsey to a hearing. The relevant background is that on July 27, 2016, the trial court ordered that a voucher for expert services be issued to Technical Associates, Inc. ("Technical Associates"), to permit Marc Taylor, a DNA-analysis

---

[6] In *Dorsey I*, we similarly concluded that in the absence of information about "what else a defense expert might have established," we could "say with fair assurance that the outcome [of appellant's trial] was not 'substantially swayed' by the trial court's ruling that trial would proceed" without a continuance and thus without a defense DNA expert. 154 A.3d at 122. That determination does not dictate the outcome here. For one thing, in *Dorsey I*, our focus was on the prejudice *vel non* from denial of a continuance; here, by contrast, we are obligated to consider not only whether appellant was prejudiced by his trial counsel's failure to do what was necessary to arrange for a defense DNA expert to testify, but also whether counsel's failure earlier to retain an expert adversely impacted counsel's preparation to cross-examine the government's expert. In addition, in considering appellant's § 23-110 motion, the trial court was not similarly situated vis-à-vis this court in *Dorsey I*: there, appellant had not said "what else a defense expert might have established," 154 A.3d at 122; by contrast, in the proceeding in issue here, the trial court had (and we have) the report of a DNA expert whom appellant retained.

expert identified by appellant's § 23-110 counsel, "to examine evidence, perform necessary testing, and assist Mr. Dorsey and his counsel . . . ." A summary report by a Senior Forensic Scientist with that firm (but no affidavit or declaration) is attached to appellant's § 23-110 motion. That expert report states that "[t]here are numerous scenarios in which cellular material could transfer to an item that a person has not touched[,]" and describes three examples. Notably, however, the Technical Associates, Inc., report does not assess the likelihood that such a transfer (to the gun) occurred in this case. Likewise, although the report refers to "deteriorative loss[]" of DNA samples at some temperatures, the report does not attempt to explain why appellant's DNA alone was found on the gun. Nor did appellant attach to his motion an affidavit from a DNA expert indicating how the expert might testify in those regards. Further, nothing in the Technical Associates, Inc., report calls into question Ms. Borchardt-Gardner's technique or analysis; to the contrary, the report concludes that Bode utilized appropriate controls during the testing and that Bode's conclusions "appear valid as presented[.]"

Mr. Dorsey argues persuasively, however, that what his trial counsel lacked without expert assistance, and what the Technical Associates report provides is, "a good reason [for the jury] to consider his theory" of indirect DNA transfer or possible contamination. The Technical Associates report states that "[s]econdary

and tertiary transfer have been demonstrated in scientific literature and in research projects," thus referring to what was ostensibly a weight of research going beyond the single "scholarly article" on the topic Ms. Borchardt-Gardner acknowledged having read. *See* 154 A.3d at 111. Further, the Technical Associates report points to the possibility that its forensic scientists might have had additional research results available for presentation at a hearing. Specifically, the report states that although Technical Associates did not seek to re-examine or re-swab the gun, "presumably, the evidence in this case is still available for re-examination and re-swabbing." To hold on this record that Mr. Dorsey was not entitled to a hearing to attempt to demonstrate how he was prejudiced by his trial counsel's failure to obtain DNA-expert assistance, we would have to conclude that his § 23-110 counsel was obliged to obtain (and the court was required to finance) the scientific workup of this case to a point ready for trial before a hearing could be had on the § 23-110 motion. Given that "[a]ny question regarding the appropriateness of a hearing on a § 23-110 motion should be resolved in favor of holding a hearing," *Brown v. United States*, 181 A.3d at 171 (internal quotation marks and brackets omitted), we are unwilling to reach that conclusion. We therefore hold that Mr. Dorsey was entitled to a hearing on this aspect of his ineffective-assistance claim.

**IV.**

Prior to Ms. Borchardt-Gardner's testimony, the prosecutor disclosed that Ms. Borchardt-Gardner was involved in a romantic relationship with the Assistant United States Attorney ("AUSA") who served as Special Counsel for DNA at the United States Attorney's Office. During Ms. Borchardt-Gardner's time on the witness stand, neither party asked her about the relationship. The following Monday, when Ms. Borchardt-Gardner was no longer available, the trial court remarked that appellant had expressed "concern[] that his attorney had not cross-examined the DNA expert on [the issue of her relationship]." The trial court reasoned that appellant had "a right to have the jury know about the relationship." At the court's urging, the parties worked out a stipulation that was read to the jury.[7]

---

[7] The stipulation was as follows:

> Before this trial began, the United States disclosed to the defendant that its DNA expert, Ms. Gardner, is currently in a romantic relationship with [the] Assistant US . . Attorney who is Special Counsel for DNA at the U.S. Attorney's Office in Washington, D.C. [The] AUSA . . . has not consulted with the analysts at Bod[]e Technology regarding their results or analyses in this case. Had Ms. Gar[d]ner been asked about this relationship by counsel for the defendant, she would have testified that she is, in fact, in a relationship with [the] Assistant US Attorney . . . and that this relationship did not in any way affect her analysis.

(continued…)

The trial court found that Mr. Jones's agreement to the stipulation did not render his representation of appellant deficient since the stipulation allowed the jury to "weigh the issue of pretrial witness bias." The court also found (presumably for that reason) that cross-examination would not have impacted the probable outcome of the case. Appellant accepts that the stipulation, which he did not approve, adequately addressed the expert's "pretrial bias in analysis," but asserts that the stipulation was not an adequate substitute for cross-examination because it did not address Ms. Borchardt-Gardner's "current potential testimonial bias" and because it deprived the jury of the chance to assess her credibility if confronted with the fact of her relationship with the AUSA.

The government argued in the trial court that Mr. Jones's decision not to cross-examine Ms. Borchardt-Gardner about her relationship with the AUSA reflected "a tactical decision . . . to focus on substantive evidence and not devolve

---

(…continued)

> Ms. Gardner would have further testified that she has not discussed this case or any of her analysis related to this case with [the] AUSA . . . . In addition, all of the testing and statistical analysis on this case was completed by Ms. Gardner and others at Bod[]e Technology before she even began dating [the AUSA].

into overly personal inquiries." We think that for the trial court to reach the conclusion that agreeing to the stipulation was either a reasonable tactical decision[8] or was not a tactical decision at all, it would have been necessary for the court to hear from Mr. Jones in a hearing on appellant's motion. With regard to *Strickland* prejudice, the trial court focused on its perception that the stipulation adequately gave the jury the tools to "weigh the issue of pretrial witness bias" but did not explicitly consider whether cross-examination might have impacted the jury's assessment of Ms. Borchardt-Gardner's testimony about secondary transfer. We cannot conclude at this point that an evidentiary hearing is warranted on this aspect of appellant's claim, but the trial court should reconsider the issue in conjunction with the hearing on whether the *Strickland* test is satisfied as it applies to Mr. Dorsey's claim that his trial counsel provided constitutionally ineffective assistance by failing to obtain the services of a DNA expert.

## V.

Appellant's motion asserted that his counsel rendered ineffective assistance by failing to interview and call as witnesses Nika Dorsey (who was appellant's

---

[8] We are mindful that stipulations generally are thought to have "inferior probative value" compared with the "significant advantages" of live testimony. *Rollerson v. United States*, 127 A.3d 1220, 1229 (D.C. 2015).

wife by the time of his § 23-110 motion) and Jonte Watts (their son). Appellant asserts that Nika Dorsey could have testified about why appellant happened to walk in the direction of the kitchen when he entered the apartment from the balcony after seeing police arrive (providing "an innocent explanation for [appellant's] presence near the kitchen area as the police entered" the apartment). Appellant asserts that Jonte Watts would have testified that from where he was sitting in a bedroom, he would have seen appellant in the hallway if appellant had gone into the kitchen, but did not see him there.

The trial court quite reasonably concluded that the testimony of these witnesses — who, we note, would surely have been impeached based on their bias in favor of appellant — "would not have affected the probable outcome of the case[.]" As the trial court emphasized, "neither . . . had exculpatory information that could have refuted the presence of [appellant's] DNA on the gun or undermined the theory of constructive possession."[9] Order at 5. Even if Nika

---

[9] We note that during closing argument, while Mr. Dorsey's trial counsel highlighted the reasons why the jury should disbelieve Detective Campanalle's testimony that he saw Mr. Dorsey "exiting the kitchen area" as the officers burst into the apartment, *Dorsey I*, 145 A.3d at 111, the prosecutor in rebuttal emphasized the evidence of "only one person's DNA." Testimony from Nika Dorsey and Jonte Watts might have put distance between Mr. Dorsey and the kitchen at the time the search warrant was executed and thus called into question the officers' decision to arrest Mr. Dorsey on that day, but the later-obtained DNA
(continued…)

Dorsey's and Jonte Watts's statements in their declarations are taken as entirely true, we can discern no erroneous exercise of discretion in the court's reasoning about the likely nil impact that their testimony, even if found to be true, would have had on the outcome of appellant's trial.[10]  Thus, no hearing was warranted on this aspect of Mr. Dorsey's ineffective-assistance claim, because his allegations about how Nika Dorsey and Jonte Watts would have testified "merit no relief even if true." *Little*, 748 A.2d at 922.[11]

## VI.

Appellant's final claim is that his trial counsel rendered ineffective assistance by failing to file a motion to suppress the gun and other evidence seized during execution of the search warrant.  Appellant stated in a declaration

---

(…continued)
analysis showing his DNA and no one else's on the gun would surely have led to his eventual arrest.

[10]  Moreover, "[w]here a witness is of minimal value to the defense, it is not unreasonable for an attorney to for[]go the use of that witness at trial." *Lopez v. United States*, 863 A.2d 852, 862 (D.C. 2004).

[11]  And while we have no trouble agreeing that Mr. Jones's apparent failure to interview these witnesses calls his performance into question, we cannot say, based on what their declarations indicate would have been their testimony, that any error by Mr. Jones in not calling these witnesses "was so fundamental as to call the fairness of the trial into doubt." *Harrington*, 562 U.S. at 110.

accompanying his motion that Mr. Jones told him that he would not file a suppression motion because appellant did not have "standing" to challenge the search of the apartment. Appellant's declaration avers, however, that appellant "regularly visited the apartment"[12] (although the declaration does not state whether Mr. Dorsey so informed his counsel). Accordingly, appellant's motion placed in issue (1) whether appellant had a sufficient privacy interest in the apartment, including its kitchen area, that a suppression motion would not have failed for lack of "standing,"[13] and (2) whether Mr. Jones actually and reasonably relied on lack of standing as his rationale for declining to file a suppression motion.[14] Evidence

---

[12] In addition, in her grand jury testimony, Nika Dorsey stated that appellant resided in the apartment.

[13] *See, e.g.*, *Minnesota v. Carter*, 525 U.S. 83, 89 (1998) ("[I]n some circumstances a person may have a legitimate expectation of privacy in the house of someone else."); *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990) (establishing that an overnight guest in a house may have an expectation of privacy that the Fourth Amendment protects); *see also id.* at 99 ("It is unlikely that the guest will be confined to a restricted area of the house[.]").

[14] The trial court found that Mr. Jones's decision not to bring a motion to suppress was strategic, i.e., consistent with counsel's strategy of avoiding the introduction of evidence connecting appellant to the apartment. We are doubtful that this strategy would have been objectively reasonable, as appellant could have testified about his claimed regular presence in the apartment during a hearing on a suppression motion without having his testimony used against him at trial (e.g., on the issue of constructive possession of the gun). *See Simmons v. United States*, 390 U.S. 377, 394 (1968) (holding that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes

(continued…)

presented at a hearing on those issues might support appellant's claim that his counsel provided deficient representation.

Further, appellant's § 23-110 motion argued that the search warrant application lacked probable cause on its face. The warrant application sought authority to search for, among other things, handbags stolen from a Burberry store in Virginia. Appellant's § 23-110 motion asserted that the warrant application lacked specific, particularized facts connecting the apartment to criminal activity and contained no information about when a vehicle associated with the theft was titled with the apartment's address. The motion also argued that the officers' reliance on the warrant to search the apartment was objectively unreasonable. The trial court reasoned that not filing a suppression motion did not amount to deficient representation because there was no evidence in the record "to suggest that the four corners of the warrant lacked probable cause" or that the officers who executed the search warrant did not objectively rely in good faith on the warrant. The court concluded that appellant would not have been entitled to relief on a suppression

---

(…continued)

no objection."). In any event, appellant argues that the court's finding that Mr. Jones's decision not to file a suppression motion was strategic was "purely speculative[,]" and asserts that the record does not support that counsel wanted to put distance between appellant and the apartment. Whether Mr. Jones's reason for not filing a suppression motion was strategic is an issue to be resolved through a hearing.

motion and therefore could not show prejudice from Mr. Jones's failure to file the motion.

We discern no error in the trial court's conclusion without a hearing that the warrant application on its face did not show a lack of indicia of probable cause to search the apartment for the stolen items. That is also the conclusion reached by the United States District Court for the District of Columbia in *Dorsey v. District of Columbia*, 234 F. Supp. 3d 1, 9 (D.D.C. 2017) ("[P]robable cause existed to support the [w]arrant insofar as it sought to search Apt. 31 for evidence of the purse theft or suspicious clothing."). The issue as we see it is whether appellant's § 23-110 motion papers made any "allegation of fact that would undercut the legitimacy of the . . . [o]fficers' reliance on [the] [w]arrant signed by an appropriate judicial officer." *Id.* at 10. The record shows that police had determined that the vehicle the thieves used to get away from the crime scene was titled to one Francis Taylor, who listed apartment 31 at 4701 Alabama Avenue, S.E., as his address. Appellant's declaration avers that "a marshal or someone like that" came to the apartment a few times before execution of the search warrant and was repeatedly told by appellant and Nika Dorsey that Francis Taylor (Nika Dorsey's cousin) did not live there. Nika Dorsey's declaration avers that the marshals were "from Virginia" and that "[t]o the best of [her] knowledge, Officer

Dempster who got the warrant to search [the] apartment was in touch with the Virginia police before he got the warrant." Appellant also averred that during the search, officers stated that they had already been to Francis Taylor's residence and to the residence of the mother of Mr. Taylor's child.

The District Court, ruling on a motion to dismiss, was presented with similar evidence[15] but was not troubled by it, reasoning that "it is not entirely unusual for persons in D.C. to have multiple locations at which they might sleep, particularly moving between relatives and girlfriends[,]" and "find[ing] nothing untoward about [the officers] going on to an alternate, likely, location" once they "failed to locate evidence of the theft at the first address[.]" *Dorsey v. District of Columbia*, 234 F. Supp. 3d at 9. However, neither we nor the trial court is bound by the District Court's ruling (and the government has not argued that appellant is estopped from urging a contrary ruling here). Moreover, even when armed with a valid warrant, officers are required to refrain from searching a premises if they are "on notice of the risk that they might be [about to search] a unit erroneously included within the terms of the warrant." *Maryland v. Garrison*, 480 U.S. 79, 87

---

[15] "Plaintiffs argue that the police knew of, and had already searched on that day, a different address thought to be where Mr. Taylor lived. Police suspicion of this other address was omitted from the [a]ffidavit." *Dorsey v. District of Columbia*, 234 F. Supp. 3d at 9.

(1987). Thus, if, as the Dorseys' declarations suggest, the officers had reason to know that the apartment was not or was no longer the residence of Francis Taylor, they at least arguably were not entitled to rely on the search warrant. Given the presumption in favor of hearings on § 23-110 motions, we think the trial court erroneously exercised its discretion when it denied a hearing on the ground that appellant did not "proffer sufficient evidence" to raise an issue of whether the officers' reliance on the warrant was not in good faith. We cannot say (and we think the trial court would not have had an adequate basis for saying) "that under no circumstances could [appellant] establish facts warranting relief." *Steward*, 927 A.2d at 1087 (internal quotation marks omitted). As the record does not "conclusively show" that appellant would have been "entitled to no relief" on a motion to suppress, D.C. Code § 23-110(c), we conclude that a hearing was necessary to determine "definitively whether the motion to suppress would have been granted." *Watley v. United States*, 918 A.2d 1198, 1201 (D.C. 2007) (internal quotation marks and brackets omitted). "Without the benefit of an evidentiary hearing, it is impossible to conclude definitively that the motion to suppress would [not] have been granted, and therefore that the failure of [appellant's] trial counsel to file the motion [did not] create[] a reasonable probability" of a different outcome. *Hockman v. United States*, 517 A.2d 44, 52 (D.C. 1986) (internal quotation marks omitted).

## VII.

For the foregoing reasons, we vacate the order denying appellant's § 23-110 motion and remand the matter for a hearing on appellant's claim related to his trial counsel's failure to obtain a defense DNA expert and failure to file a suppression motion.

*So ordered.*